UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | CRIMINAL NO. **05** CR **10022** GAO |
| UNITED STATES OF AMERICA ) | |
| ) | VIOLATIONS: |
| v. ) | 18 U.S.C. §371 (conspiracy to defraud United States |
| ) | and to commit offenses) |
| CARLOS GOMEZ and ) | 18 U.S.C. §1341 (Mail Fraud) |
| MARY GILDEA, ) | 18 U.S.C. §1027 (ERISA false statement) |
| ) | 26 U.S.C. §7206(1) (subscribing false tax return) |
| defendants. ) | |
| _____) | |

INFORMATION

The United States Attorney Charges that:

## ALLEGATIONS COMMON TO ALL COUNTS

**The Defendants**

1.    At times pertinent to this Information, defendant CARLOS GOMEZ ("GOMEZ") was an individual who resided in North Reading in the District of Massachusetts. At times pertinent to this Information, GOMEZ owned and operated Lanco Scaffolding, Inc.

2.    At times pertinent to this Information, defendant MARY GILDEA ("GILDEA") was an individual who resided in North Reading in the District of Massachusetts. At times pertinent to this Information, GILDEA was married to defendant GOMEZ and helped operate Lanco Scaffolding, Inc.

3.    At times pertinent to this Information, Lanco Scaffolding, Inc. ("Lanco") maintained business offices at 33 Earle Street, Somerville, Massachusetts.

4.    At times pertinent to this Information, Lanco was in the business of supplying, erecting and dismantling scaffolding, primarily for use in construction projects.

5.    At times pertinent to this Information, Lanco employed 20 or more persons to provide services in connection with the scaffolding business.

## The Federal Employment/Payroll Tax System

6.    At all times pertinent to this Information, Federal tax laws have required employers to file Form 941, Employer's Quarterly Federal Tax Return, in order to report and pay all federal employment taxes, as well as income taxes withheld from employees' paychecks. Employers must file Form 941 for each quarter ending March 31st; June 30th; September 30th; and December 31st, every year.

7.    At all times pertinent to this Information, Federal employment taxes have consisted of Social Security Tax and Medicare Tax. The Federal employment tax rate is 15.3 % of an employee's wages. Employers are liable for half (½) of this 15.3% (i.e., 7.65%), while each employee is responsible for the remaining half (i.e., an additional 7.65%). Employers are required by Federal law to withhold employees' share of Federal employment taxes. In connection with the filing of their Forms 941, employers are responsible for reporting and paying to the United States Internal Revenue Service (IRS) both the employers' and the employees' share of employment taxes.

8.    At all times pertinent to this Information, on an annual basis, employers have also been required to file Forms W-2 for each of their employees. On the W-2, the employer reports to each employee and to the IRS all wages paid to the employee and all taxes that have been withheld from those wages. One copy of the form W-2 is provided to the employee and another is filed with the IRS. A separate form W-2 is required for each employee for each tax year.

### The Workers Compensation Insurance System In Massachusetts

9. At times pertinent to this Information, the laws of the Commonwealth of Massachusetts have required all employers in Massachusetts to obtain workers compensation insurance coverage in order to ensure that employees who suffer work-related injuries will be compensated in accordance with the workers compensation laws of the Commonwealth.

10. As with other forms of insurance, employers obtain workers compensation insurance by paying a fee, known as a "premium," to an insurance company, in exchange for which the insurance company agrees to assume the employer's "liability" or risk of loss.

11. For most employers, the fees that insurance companies may charge for workers compensation insurance are established by law and regulation.

12. As with other forms of insurance, premiums for workers compensation insurance are based in part on factors related to the degree of risk the insurance company is assuming. The following factors are used in calculating a particular employer's workers compensation insurance premium: (1) the total wages of the employees to be covered (known as "payroll"); (2) the nature of the employees' work activities (known as "classification"); and (3) the employer's past history of work-related injuries (known as "experience modification").

13. Job classification codes are established by the Massachusetts Workers Compensation Rating and Inspection Bureau. Insurance rates for different classifications are designed to reflect the degree of risk associated with different jobs. For example, workers compensation coverage for an office worker (with a relatively low risk of serious on-the-job injury) costs less than coverage for a scaffolding worker (with a much higher risk of serious on-the-job injury).

14.    In construction and related industries, each job or trade is assigned a classification code specifically describing that trade. Each classification, in turn, is assigned an insurance rate, based upon historical data reflecting losses from injuries to workers in that classification.

15.    Ordinarily, at the beginning of a period of insurance coverage, an employer is required to provide its insurance company with estimates of its anticipated payroll, as well as the job classifications of its employees. These estimates provide a basis for determining an estimated premium, some or all of which the insurer may require the employer to pay at the beginning of the period.

16.    At the close of a period of insurance coverage, the insurance company conducts an "audit" of the employer's payroll during the period. In the audit, the employer supplies the insurance provider with records showing the employer's payroll and employee classifications during the period. If an employer's actual payroll turns out to be higher than its original estimate, the employer may have to pay an additional premium. If an employer's actual payroll turns out to be lower than the estimate, the employer may receive a credit or refund. Under the insurance agreement, the employer is ordinarily required to allow the insurance company access to any books and records necessary to verify the employer's payroll, including copies of employment tax filings.

**The Insurers**

17.    For the period beginning on or about April 1, 1996, and continuing until on or after March 29, 2000, Lanco purchased its workers compensation insurance policies from Eastern Casualty Insurance Company ("Eastern Casualty").

4

18.    For the period beginning on or about March 29, 2000, and continuing until on or after October 31, 2003, Lanco purchased its workers compensation insurance policies from Liberty Mutual Insurance Company ("Liberty Mutual").

19.    At times pertinent to this Information, Eastern Casualty maintained a place of business at Marlborough, in the District of Massachusetts.

20.    At times pertinent to this Information, Liberty Mutual maintained a place of business at Boston, in the District of Massachusetts.

21.    At times pertinent to this Information, it was the regular business practice of Eastern Casualty to send various items relating to pricing and billing for insurance policies by the U.S. Postal Service, including notices reflecting interim and final bill amounts and invoices for payment.

22.    At times pertinent to this Information, it was the regular business practice of Liberty Mutual to send various items relating to pricing and billing for insurance policies by the U.S. Postal Service, including notices reflecting interim and final bill amounts and invoices for payment.

### The Union Health and Welfare Trust Funds

a.    The Laborers' Trust Funds

23.    At all times pertinent to this Information, the Massachusetts Laborers' District Council of the Laborers' International Union of North America (the "Laborers' Union") was a labor organization headquartered in the District of Massachusetts. The Laborers' Union's membership included scaffolding workers.

5

24.    At all times pertinent to this Information, Lanco was an employer of scaffolding workers and was a signatory to, and was bound by, collective bargaining agreements with the Laborers' Union.

25.    At all times pertinent to this Information, under the terms of its collective bargaining agreement with the Laborers' Union, Lanco was required to make payments to various trust funds that operated employee benefit plans, including but not limited to: Massachusetts Laborers' Health and Welfare Fund; Massachusetts Laborers' Health and Safety Fund; Massachusetts Laborers' Pension Fund; and Massachusetts Laborers' Annuity Fund (collectively referred to as the "Laborers' Trust Funds").

26.    At all times pertinent to this Information, the collective bargaining agreements between Lanco and the Laborers' Union required that Lanco pay particular amounts to the appropriate Laborers' Trust Funds each month on behalf of employees covered by those collective bargaining agreements. Such required payments were based upon the number of hours worked each month by each employee whose duties were covered by the Laborers' Union collective bargaining agreements.

27.    To facilitate the calculation and collection of payments and benefits, Lanco was provided with a monthly form, entitled "Employer's Remittance Report," on which to report all hours worked by laborers, identifying each individual performing laborer's work for Lanco, together with the number of hours worked each month. The "Employer's Remittance Report" provided appropriate spaces to calculate and declare the amount of the employer's contribution to the Laborers' Trust Funds.

28.    At times pertinent to this Information, the Employer's Remittance Report included an express warning that "Any false statement or misrepresentation made in reporting on this form may subject you to prosecution under 18 USC section 1027 . . . ."

29.    At all times pertinent to this Information, the Laborers' Trust Funds referenced above were employee benefit plans subject to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), Title 29, United States Code, Sections 1001 et seq., a federal law enacted to protect employee pension and welfare benefit plans and their participants and beneficiaries by establishing requirements for reporting, record keeping, disclosure and other matters affecting the operation of such plans.

30.    Under ERISA, each of the Laborers' Trust Funds was required to publish and file annual financial reports, known as Form 5500 Reports, with the United States Secretary of Labor. ERISA also required the Laborers' Trust Funds to keep and maintain all documents necessary to verify, explain, clarify and check for accuracy the completeness the annual Form 5500 Reports that each of the Laborers' Trust Funds was required to file.

31.    Pursuant to the provisions of ERISA, the Laborers' Trust Funds were required to keep and maintain the Employer's Remittance Reports that Lanco submitted each month, together with all other reports of employers' contributions, in order to verify, explain, clarify and check for accuracy the completeness of each fund's annual Form 5500 Report.  Specifically, the information set forth in the Employer's Remittance Reports regarding the number of laborers employed by Lanco, the hours they worked, and the employer's contributions on behalf of those laborers were facts the accurate disclosure of which was necessary to verify, explain, clarify and check for accuracy and completeness the Form 5500 Reports that each of the Laborers' Trust Funds was required to file.

7

b.    The Carpenters' Trust Funds

32.    At all times pertinent to this Information, the New England Regional Council of Carpenters of the United Brotherhood of Carpenters and Joiners of America (the "Carpenters' Union") was a labor organization headquartered in the District of Massachusetts. The Carpenters' Union's membership included certain carpenters who worked on scaffolding.

33.    At all times pertinent to this Information, Lanco was an employer of carpenters who worked on scaffolding and was a signatory to, and was bound by, collective bargaining agreements with the Carpenters' Union.

34.    At all times pertinent to this Information, under the terms of its collective bargaining agreement with the Carpenters' Union, Lanco was required to make payments to various trust funds that operated employee benefit plans, including but not limited to: Massachusetts State Carpenters Pension Fund; Massachusetts State Carpenters Guaranteed Annuity Fund; and Massachusetts State Carpenters Health Benefits Fund (collectively referred to as the "Carpenters' Trust Funds"). Collection of employer contributions to all of the Carpenters' Trust Funds was handled through the Massachusetts Carpenters Central Collection Agency.

35.    At all times pertinent to this Information, the collective bargaining agreements between Lanco and the Carpenters Union required that Lanco pay particular amounts to the appropriate Carpenters' Trust Funds each month on behalf of employees covered by those collective bargaining agreements. Such required payments were based upon the number of hours worked each month by each employee covered by the Carpenters Union collective bargaining agreements.

36.    To facilitate the calculation and collection of payments and benefits, Lanco was provided with a monthly form, entitled "Employer's Monthly Remittance Report," which reported

all hours worked by carpenters, identifying each individual carpenter working for Lanco, together with the number of hours worked each month. This report provided appropriate spaces to calculate and declare the amount of the employer's contribution to the Carpenters' Trust Funds.

37.    At times pertinent to this Information, the Employer's Monthly Remittance Report included an express warning that "Any false statement or representation made in reporting on this form may subject you to prosecution under 18 USC section 1027 . . . ."

38.    At all times pertinent to this Information, the Carpenters' Trust Funds referenced above were employee benefit plans subject to ERISA.

39.    Under ERISA, each of the Carpenters' Trust Funds was required to publish and file annual financial reports, known as Form 5500 Reports, with the United States Secretary of Labor. ERISA also required the Carpenters' Trust Funds to keep and maintain all documents necessary to verify, explain, clarify and check for accuracy the completeness the annual Form 5500 Reports that each of the Carpenters' Trust Funds was required to file.

40.    Pursuant to the provisions of ERISA, the Carpenters' Trust Funds were required to keep and maintain the Employer's Remittance Reports that Lanco submitted each month, together with all other reports of employers' contributions, in order to verify, explain, clarify and check for accuracy the completeness of each fund's annual Form 5500 Report. Specifically, the information set forth in the Employer's Remittance Reports regarding the number of carpenters employed by Lanco, the hours they worked, and the employer's contributions on behalf of those carpenters were facts the accurate disclosure of which was necessary to verify, explain, clarify and check for accuracy and completeness the Form 5500 Reports that each of the Carpenters' Trust Funds was required to file.

9

    c.    Auditing Union Trust Fund Contributions

41.    At times pertinent to this Information, it was the practice of both of the Laborers' Union and the Carpenters Union to conduct periodic audits of employers' payroll records in order to confirm the accuracy of the employers' representations in monthly remittance reports. In the course of such audits, it was the usual practice to compare copies of the Employer's Quarterly Federal Tax Returns (Form 941) with the payroll records provided, in order to verify the accuracy of the information provided.

### "Under-the-Table" Payroll Schemes (Background)

42.    A common method by which employers evade employment taxes and workers compensation insurance premiums is to pay employees in cash or check, without withholding taxes and without reporting that payroll to the workers compensation insurance company.

43.    Paying employees in a manner that results in failing to withhold or pay over payroll taxes is commonly referred to as paying "under-the-table."

44.    Under-the-table payments commonly are made from an account other than the employer's regular payroll bank account. The employer omits these under-the-table payments from the gross wages reported on its quarterly tax returns (Form 941) and from any forms W-2 provided to its employees. The employer also omits these under-the-table payments from any payroll records provided to the insurance company in any end of term audit.

45.    By paying employees under-the-table, an employer evades its share of the employees' employment taxes, or 7.65% of the employees' wages and effectively causes its employees to evade their share of the employment taxes as well.

46.    By paying employees under-the-table, an employer also evades its workers compensation insurance premiums.

47.    By paying employees under-the-table, an employer may also evade its obligations to pay funds to health and pension benefit plans pursuant to the terms of the employer's contracts with the unions representing some or all or its employees.

## COUNT ONE

## CONSPIRACY (18 U.S.C. §371)

48. The United States Attorney realleges and incorporates by reference paragraphs 1-47 of this Information, and further charges that:

49. Beginning some time prior to April 1, 1996, and continuing until in or about December 2003, at Somerville and North Reading in the District of Massachusetts and elsewhere,

### CARLOS GOMEZ

and

### MARY GILDEA

defendants herein, together with others known and unknown to the United States Attorney, knowingly and unlawfully conspired and agreed with each other:

to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment and collection of the revenue; to wit, employment and income taxes; and

to commit offenses against the United States, specifically:

Having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice and attempting to do so, to place and cause to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service or by private or commercial interstate carrier, in violation of Title 18, United States Code, Section 1341; and

In documents required by title I of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, to be published or kept as part of the records of employee welfare benefit plans and employee pension benefit plans, and certified to the administrators of such plans, to make and cause to be made false statements and representations of fact, knowing them to be false, and knowingly to conceal, cover up and fail to disclose facts, the disclosure of which was necessary to verify, explain, clarify and check for accuracy and completeness reports that were required to be published and information required to be certified, by ERISA, in violation of Title 18, United States Code, Section 1027.

All in violation of Title 18, United States Code, Section 371.

## OBJECTIVES OF THE CONSPIRACY

50.    A major purpose and objective of the conspiracy was to enable GOMEZ, GILDEA and Lanco fraudulently to avoid paying a portion of the federal employment taxes that were owed in connection with the operation of their scaffolding business.

51.    A second major purpose and objective of the conspiracy was to enable GOMEZ, GILDEA and Lanco to fraudulently reduce the premiums for workers compensation insurance that were owed in connection with the operation of their scaffolding business.

52.    A third major purpose and objective of the conspiracy was to enable GOMEZ, GILDEA and Lanco to under-report and under-pay contributions that were required to be paid, on a monthly basis, to the Laborers' Trust Funds and the Carpenters' Trust Funds.

53.    A further purpose and objective of the conspiracy was to enable GOMEZ, GILDEA and Lanco to avoid collecting and paying to the IRS income tax withholding amounts for employees of their scaffolding business.

13

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the conspirators accomplished the goals of the conspiracy included, among others, the following:

54.    As detailed below, during the period beginning in or about March 1, 1996 and continuing through October 2003, GOMEZ, GILDEA and Lanco defrauded the IRS, two insurance companies, the Laborers' Trust Funds and the Carpenters' Trust Funds, by intentionally understating the amounts that Lanco paid to its workers, the number of workers Lanco employed, and the number of hours worked by Lanco's workers, thereby evading a significant portion of Lanco's employment taxes, workers' compensation insurance premiums, and employee benefit contributions.

55.    As detailed below, GOMEZ, GILDEA and Lanco executed the fraud scheme: (1) by paying employees cash "under-the-table," which payroll was not reported to either the IRS or to the workers compensation insurance companies; (2) by providing forged and fraudulent payroll records, together with forged and fraudulent "copies" of their quarterly tax returns (Forms 941) to insurance auditors, thereby reporting an even lower payroll figure to Lanco's insurers than the already fraudulent payroll figures that had been reported to the IRS; and (3) by providing false remittance reports each month to the administrators of the Laborers' Trust Funds and the Carpenters' Trust Funds and by providing forged and fraudulent "copies" of their quarterly tax returns (Forms 941) to auditors for those trust funds.

### Under-the-Table Payments to Employees

56.    It was part of the conspiracy that GOMEZ and GILDEA would and did arrange to pay Lanco employees in cash, and by check, without reporting such payments to the IRS or to

Lanco's workers compensation insurer. From October 1997 through September 2003, GOMEZ and GILDEA paid Lanco workers at least $2,900,000 in unreported cash.

57.    It was part of the conspiracy that GILDEA administered Lanco's office procedures in such a way that records of under-the-table cash and check payments to employees were not maintained in the computerized books and ledgers that were used to record and calculate Lanco's payroll data for purposes of federal tax reporting and payment.

### Administering the Cash Payroll

58.    It was part of the conspiracy that GILDEA calculated, on a weekly basis, the total amount of cash and checks needed for under-the-table cash payments to Lanco employees.

59.    It was part of the conspiracy that, at some times pertinent to this Information, GOMEZ and GILDEA would and did obtain cash on a weekly basis, in amounts ranging as high as $7,800 per week, in order to meet Lanco's under-the-table payroll.

60.    It was part of the conspiracy that GOMEZ and others would and did distribute cash and checks to Lanco employees.

61.    It was part of the conspiracy that some Lanco employees were paid solely under-the-table while others received a portion of their pay under-the-table and another portion through a properly recorded payroll check. In addition, a few employees received most or all of their compensation through properly recorded payroll checks.

### Filing False Tax Returns and Willful Failure to File Returns

62.    It was part of the conspiracy that GILDEA would and did prepare and file employment tax returns, including Form 941, Employer's Federal Quarterly Tax Return, for Lanco, which returns were false in that they failed to include under-the-table cash payments to employees of the business.

**Defrauding Workers Compensation Insurers**

63.   It was part of the conspiracy that GILDEA would and did provide auditors from Lanco's workers compensation insurers with forged and fraudulent payroll records which reflected payments only to approximately five employees.

64.   In actuality, as GILDEA well knew, Lanco employed many more workers and its total payroll substantially exceeded the figures provided to Lanco's workers compensation insurers.

65.   It was part of the conspiracy that GILDEA told auditors for Lanco's workers compensation insurers that Lanco ordinarily employed approximately five employees. In actuality, as GILDEA and GOMEZ well knew, Lanco routinely employed more than twenty persons.

66.   For the periods March 1996 through March 2003, GILDEA and GOMEZ reported payroll totaling approximately $2,261,068 to Lanco's workers compensation insurers. In actuality, Lanco's payroll during that period exceeded $7,500,000.

67.   It was part of the conspiracy that, in order to mislead insurance company auditors, GILDEA and GOMEZ prepared, signed and arranged to provide the auditors with false and forged tax forms, which purported to be copies of Lanco's Form 941, Employer's Quarterly Federal Tax Return. These false and forged tax returns were designed to "verify" the false payroll figures that GILDEA had provided to the insurance companies. These false and forged tax returns reflected lower payroll figures than the tax returns that were actually filed with the IRS on behalf of Lanco, even though, as noted above, the Lanco employment tax returns filed with the IRS were themselves fraudulently understated due to the failure to report under-the-table cash payroll.

16

68.    It was part of the conspiracy that, for the purpose of executing the scheme to defraud Lanco's workers compensation insurers, GILDEA and GOMEZ caused various documents to be sent and delivered by the Postal Service, to wit: insurance documents that reflected fraudulently reduced premium calculations, which were based upon false representations regarding Lanco's payroll.

**Defrauding Union Trust Funds**

a.    Laborers' Trust Funds

69.    It was part of the conspiracy that GILDEA and GOMEZ would and did provide false monthly remittance reports to the Laborers' Trust Funds. In those reports GILDEA and GOMEZ listed between four (during 1998) and eight (during 2003) individual laborers. During some periods, the reports reflected that each listed laborer had worked approximately 20 hours per week. The reported 20 hours of work per week were the minimum that would entitle the named laborers to the health and welfare benefits provided by the Laborers' Trust Funds.

70.    In actuality, as GILDEA and GOMEZ well knew, Lanco routinely employed 15 or more laborers, who customarily worked 40 hours or more per week. By concealing both the true number of laborers employed, and the number of hours worked by each, GILDEA and GOMEZ defrauded the Laborers' Trust Funds by causing Lanco to pay only a small fraction of the benefit contributions required under Lanco's collective bargaining agreement with the Laborers' Union.

71.    It was part of the conspiracy that, for the purpose of executing the scheme to defraud the Laborers' Trust Funds, GILDEA and GOMEZ caused various documents to be sent and delivered by the Postal Service, including Employer's Remittance Reports mailed to the

Massachusetts Laborers' Benefit Funds, which fraudulently understated the number of laborers employed by Lanco and the hours worked by those laborers.

a.    Carpenters' Trust Funds

72.    It was part of the conspiracy that GILDEA and GOMEZ would and did provide false monthly remittance reports to the Carpenters' Trust Funds. In those reports GILDEA and GOMEZ routinely listed three individual carpenters, each working approximately 40 hours per week.

73.    In actuality, as GILDEA and GOMEZ well knew, Lanco routinely employed five carpenters, who frequently worked more than 40 hours per week. By concealing both the true number of carpenters employed, and the number of hours worked by each, GILDEA and GOMEZ defrauded the Carpenters' Trust Funds by causing Lanco to pay only portion of the benefit contributions required under Lanco's collective bargaining agreement with the Carpenters' Union.

74.    It was further part of the conspiracy that, in order to mislead auditors for the Carpenters' Trust Funds, GILDEA and GOMEZ prepared, signed and arranged to provide those auditors with false and forged tax forms, which purported to be copies of Lanco's Form 941, Employer's Federal Quarterly Tax Returns. These false and forged tax returns were designed to "verify" the false payroll figures that GILDEA and GOMEZ had provided to the Carpenters' Trust Funds in monthly remittance reports. These false and forged tax returns reflected lower payroll figures than the tax returns that were actually filed with the IRS on behalf of Lanco, even though, as noted above, the Lanco employment tax returns filed with the IRS were themselves fraudulently understated due to the failure to report under-the-table cash payroll. The false and forged tax returns that were provided to auditors for the Carpenters' Trust Funds differed from

| | |
|---|---|
| 2d  quarter  1998 | $ 144,706.39 |
| 3d  quarter  1998 | $ 149,390.61 |
| 4th  quarter  1998 | $ 160,977.10 |
| 1st  quarter  1999 | $ 143,679.10 |
| 2d  quarter  1999 | $ 158,679.25 |
| 3d  quarter  1999 | $ 160,841.85 |
| 4th  quarter  1999 | $ 168,722.17 |
| 1st  quarter  2000 | $ 145,018.85 |
| 2d  quarter  2000 | $ 156,362.85 |
| 3d  quarter  2000 | $ 161,829.45 |
| 4th  quarter  2000 | $ 166,851.05 |
| 1st  quarter  2001 | $ 164,376.45 |
| 2d  quarter  2001 | $ 224,640.20 |
| 3d  quarter  2001 | $ 229,229.00 |
| 4th  quarter  2001 | $ 230,429.00 |
| 1st  quarter  2002 | $ 149,227.00 |
| 2d  quarter  2002 | $ 158,751.70 |
| 3d  quarter  2002 | $ 168,823.15 |
| 4th  quarter  2002 | $ 190,786.25 |
| 1st  quarter  2003 | $ 162,816.40 |
| 2d  quarter  2003 | $ 187,305.50 |
| 3d  quarter  2003 | $ 188,488.75 |

79.    On or about the following dates, GILDEA provided an auditor from Eastern

Casualty with forged and fraudulent payroll journals:

| Date Provided to Eastern Casualty Auditor | Policy Period | Reported Number of Employees | Reported Payroll For Scaffolding Employees |
|---|---|---|---|
| 3/26/1997 | 3/29/96-3/28/97 | "at least 4" | $  37,068 |
| 8/06/1998 | 3/29/97-3/29/98 | 5 | $  58,889 |
| 5/19/1999 | 3/29/98-3/29/99 | 5 | $  91,643 |
| 6/14/2000 | 3/29/99-3/29/00 | 6 | $ 167,527 |

80.    On or about the following dates, in connection with final (policy year end) audits of Lanco by Eastern Casualty, GILDEA provided the auditor with forged and fraudulent "copies" of Lanco's Form 941's, purporting to verify the falsified payroll figures.

| Date Provided to Eastern Casualty Auditor | Reported Period | Reported Wages and Compensation |
|---|---|---|
| 3/26/1997 | 2d quarter 1996 | $ 22,578 |
| " | 3d quarter 1996 | $ 23,645 |
| " | 4th quarter 1996 | $ 24,103 |
| " | 1st quarter 1997 | $ 24,172 |
| 8/06/1998 | 2d quarter 1997 | $ 48,211 |
| " | 3d quarter 1997 | $ 55,422 |
| " | 4th quarter 1997 | $ 63,395 |
| " | 1st quarter 1998 | $ 57,026 |
| 5/19/1999 | 2d quarter 1998 | $ 61,105 |
| " | 3d quarter 1998 | $ 61,605 |
| " | 4th quarter 1998 | $ 65,650 |
| " | 1st quarter 1999 | $ 61,254 |
| 6/14/2000 | 2d quarter 1999 | $ 59,941 |
| " | 3d quarter 1999 | $ 66,291 |
| " | 4th quarter 1999 | $ 71,799 |
| " | 1st quarter 2000 | $ 65,717 |

81.    On or about the following dates, GILDEA provided an auditor from Liberty Mutual with forged and fraudulent payroll journals:

| Date Provided to Liberty Mutual Auditor | Policy Period | Reported Number of Employees | Reported Payroll For Scaffolding Employees |
|---|---|---|---|
| 5/11/2001 | 3/29/00- 3/29/01 | 6 (3 scaffolding) | $ 120,221 |
| May 2002 | 3/29/01- 3/29/02 | 6 (3 scaffolding) | $ 134,689 |

82.    On or about the following dates, in connection with final (policy year end) audits of Lanco by Liberty Mutual, GILDEA provided the auditor with forged and fraudulent "copies" of Lanco's Form 941's, purporting to verify the falsified payroll figures.

| Date Provided to Liberty Mutual Auditor | Reported Period | Reported Number of Employees | Reported Wages and Compensation |
|---|---|---|---|
| 5/11/2001 | 2d quarter 2000 | 6 | $ 65,091.85 |
| " | 3d quarter 2000 | 6 | $ 69,442.85 |
| " | 4th quarter 2000 | 5 | $ 75,609.25 |
| " | 1st quarter 2001 | 5 | $ 75,205.65 |
| 5/21/2002 | 2d quarter 2001 | 5 | $ 137,061.80 |
| " | 3d quarter 2001 | 5 | $ 131,996.80 |
| " | 4th quarter 2001 | 5 | $ 132,956.80 |
| " | 1st quarter 2002 | 4 | $ 45,533.80 |

83.    On multiple dates between June 2000 and June 2003, GILDEA falsely told Liberty Mutual's auditor that Lanco had employed the same four to five employees during the past ten years. In actuality, as GILDEA well knew, Lanco routinely employed more than 20 workers.

22

84.    On or about November 1, 2003, GILDEA sent an email to Liberty Mutual's auditor with an attached spreadsheet that purported to list all employees and payroll that had previously been concealed from the auditor. In actuality, as GILDEA well knew, while the November 1 spreadsheet disclosed more payroll than had previously been reported to the auditor, that spreadsheet falsely and fraudulently understated the number of persons employed by Lanco during the period reflected in the spreadsheet.

85.    On or about the following dates, GILDEA and GOMEZ provided false monthly forms, labeled "Employer's Remittance Report" to the Massachusetts Laborers' Benefit Funds, which listed individual laborers employed by Lanco, and their hours of work, as follows:

| Date of Employer's Remittance Report | Reported Period | Reported Number of Laborers | Reported Total Laborers' Hours |
|---|---|---|---|
| 3/3/1998 | February 1998 | 4 | 320 |
| 9/20/1999 | August 1999 | 5 | 400 |
| 12/31/1999 | December 1999 | 5 | 500 |
| 12/8/2000 | November 2000 | 5 | 480 |
| 1/14/2001 | December 2000 | 8 | 840 |
| 8/20/2001 | July 2001 | 7 | 600 |
| 11/20/2002 | October 2002 | 8 | 1,280 |
| 1/20/2003 | December 2002 | 8 | 1,280 |
| 8/10/03 | July 2003 | 8 | 1,280 |
| 11/20/2003 | October 2003 | 8 | 1,600 |

86.    On or about the following dates, GILDEA and GOMEZ provided false monthly

forms, labeled "Employer's Monthly Remittance Report" to the Massachusetts Carpenters

Central Collection Agency, which listed individual carpenters employed by Lanco, and their hours

of work, as follows:

| Date of Employer's Monthly Remittance Report | Reported Period | Reported Number of Carpenters | Reported Total Carpenters' Hours |
|---|---|---|---|
| 6/8/1998 | May 1998 | 4 | 412 |
| 12/31/1998 | December 1998 | 3 | 400 |
| 9/20/1999 | August 1999 | 3 | 320 |
| 6/10/2000 | May 2000 | 3 | 320 |
| 1/15/2001 | December 2000 | 3 | 500 |
| 6/13/2001 | May 2001 | 3 | 400 |
| 11/5/2001 | October 2001 | 3 | 400 |
| 10/30/2002 | September 2002 | 4 | 480 |
| 4/30/2003 | March 2003 | 3 | 480 |
| 12/10/03 | November 2003 | 3 | 480 |

87.    On or about the following dates, in connection with audits of Lanco's submissions

to the Carpenters' Trust Funds, GILDEA provided the auditors with forged and fraudulent

"copies" of Lanco's Form 941's, purporting to corroborate falsified Employer's Monthly

Remittance Reports:

| Date Provided to Carpenters' Trust Funds Auditor | Reported Period | Reported Total Number of Employees | Reported Wages and Compensation |
|---|---|---|---|
| Feb. - Mar. 2002 | 1st quarter 1999 | 9 | $ 83,562.05 |
| " | 2d quarter 1999 | 9 | $ 80,585.40 |
| " | 3d quarter 1999 | 9 | $ 88,655.85 |

| Date Provided to Carpenters' Trust Funds Auditor | Reported Period | | | Reported Total Number of Employees | Reported Wages and Compensation |
|---|---|---|---|---|---|
| " | 4th | quarter | 1999 | 9 | $ 95,888.17 |
| " | 1st | quarter | 2000 | 9 | $ 81,358.85 |
| " | 2d | quarter | 2000 | 9 | $ 86,498.85 |
| " | 3d | quarter | 2000 | 9 | $ 92,923.45 |
| " | 4th | quarter | 2000 | 9 | $ 99,169.05 |
| " | 1st | quarter | 2001 | 9 | $ 97,726.45 |
| " | 2d | quarter | 2001 | 9 | $ 160,150.20 |
| " | 3d | quarter | 2001 | 9 | $ 161,499.00 |
| " | 4th | quarter | 2001 | 9 | $ 162,699.20 |

All in violation of Title 18, United States Code, Section 371.

COUNTS TWO - FOUR

MAIL FRAUD (18 U.S.C. §1341)

(Defrauding Workers Compensation Insurers)

88.    The United States Attorney realleges and incorporates by reference paragraphs 1-22, 42-47, 50-68 and 76-84 of this Information, and further charges that:

89.    On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

CARLOS GOMEZ and

MARY GILDEA

defendants herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses and representations, including false representations regarding the payroll of Lanco Scaffolding, Inc., and for the purpose of executing such scheme and artifice and attempting to do so, caused to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service, to wit: insurance documents mailed to Lanco Scaffolding, Inc., which documents reflected premium calculations that were based upon false and fraudulent representations by the defendants regarding the payroll of Lanco Scaffolding, Inc.:

| Count | Mailing Date | Item Mailed |
|-------|-------------|-------------|
| 2 | 9/29/2000 | Eastern Casualty Audit Endorsement for Policy Term 3/29/99 -3/29/00 |
| 3 | 5/30/2001 | Liberty Mutual Final Audit Exhibit for Policy Term 3/29/00 -3/29/01 |
| 4 | 6/10/2002 | Liberty Mutual Final Audit Exhibit for Policy Term 3/29/01 -3/29/02 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

26

COUNTS FIVE - EIGHT

MAIL FRAUD (18 U.S.C. §1341)

(Defrauding Laborers' Trust Funds)

90.     The United States Attorney realleges and incorporates by reference paragraphs 1-8, 23-47, 50-62, 69-78 and 85-87 of this Information, and further charges that:

91.     On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

CARLOS GOMEZ and

MARY GILDEA

defendants herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice and attempting to do so, caused to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service, to wit: Employer's Remittance Reports mailed to the Massachusetts Laborers' Benefit Funds, which documents reflected false and fraudulent representations regarding the number of laborers employed by Lanco Scaffolding, Inc. and the number of hours worked by such laborers:

| Count | Date Received | Signature Date | Item Mailed |
|-------|---------------|----------------|-------------|
| 5 | 1/24/2000 | 12/31/1999 | Employer's Remittance Report, December 1999 |
| 6 | 2/16/2001 | 1/14/2001 | Employer's Remittance Report, December 2000 |
| 7 | 2/20/2002 | 1/20/2002 | Employer's Remittance Report, December 2001 |
| 8 | 12/22/2003 | 11/20/2003 | Employer's Remittance Report, October 2003 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

COUNTS NINE - TWELVE

MAIL FRAUD (18 U.S.C. §1341)

(Defrauding Carpenters' Trust Funds)

92.    The United States Attorney realleges and incorporates by reference paragraphs 1-8, 23-47, 50-62, 69-78 and 85-87 of this Information, and further charges that:

93.    On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

CARLOS GOMEZ and

MARY GILDEA

defendants herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice and attempting to do so, caused to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service, to wit: Employer's Monthly Remittance Reports mailed to Massachusetts Carpenters Central Collection Agency, which documents reflected false and fraudulent representations regarding the number of carpenters employed by Lanco Scaffolding, Inc. and the number of hours worked by such carpenters:

| Count | Date Received | Signature Date | Item Mailed |
|-------|---------------|----------------|-------------|
| 9 | 6/27/2000 | 6/10/2000 | Employer's Monthly Remittance Report, May 2000 |
| 10 | 12/14/2001 | 11/5/2001 | Employer's Monthly Remittance Report, October 2001 |
| 11 | 11/18/2002 | 10/30/2002 | Employer's Monthly Remittance Report, September 2002 |
| 12 | 12/23/2003 | 12/10/2003 | Employer's Monthly Remittance Report, November 2003 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

28

## COUNTS THIRTEEN - SEVENTEEN

### ERISA FALSE STATEMENT (18 U.S.C. §1027)

94.    The United States Attorney realleges and incorporates by reference paragraphs 1-8, 23-47, 50-62, 69-78 and 85-87 of this Information, and further charges that:

95.    On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

CARLOS GOMEZ and

MARY GILDEA

defendants herein, in documents required by title I of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, to be published or kept as part of the records of employee welfare benefit plans and employee pension benefit plans, and certified to the administrators of such plans, to make and cause to be made false statements and representations of fact, knowing them to be false, and knowingly to conceal, cover up and fail to disclose facts the disclosure of which was necessary to verify, explain, clarify and check for accuracy and completeness reports that were required to be published and information required to be certified by ERISA, namely Form 5500 Reports of Laborers' Trust Funds and Carpenters' Trust Funds, by submitting remittance reports which defendants knew falsely reported the identifies and numbers of covered employees working for Lanco Scaffolding, Inc. and the hours worked by such employees, on whose behalf Lanco Scaffolding, Inc. was required to make payments to trust funds, and which they knew falsely reported the amounts of money due and owing to such trust funds, as follows:

| Count | Date | Document Submitted | Published Report Affected |
|-------|------|--------------------|---------------------------|
| 13 | 6/10/2000 | Employer's Monthly Remittance Report, May 2000 | Form 5500 Report: Massachusetts State Carpenters Pension Fund for plan year ending 12/31/2000 |

| Count | Date | Document Submitted | Published Report Affected |
|-------|------|--------------------|-----------------------------|
| 14 | 1/14/2001 | Employer's Remittance Report, December 2000 | Form 5500 Report: Massachusetts Laborers' Health and Welfare Fund for plan year ending 6/30/2001 |
| 15 | 11/5/2001 | Employer's Monthly Remittance Report, October 2001 | Form 5500 Report: Massachusetts State Carpenters Guaranteed Annuity Fund for plan year ending 12/31/2001 |
| 16 | 1/20/2002 | Employer's Remittance Report, December 2001 | Form 5500 Report: Massachusetts Laborers' Pension Fund for plan year ending 6/30/2002 |
| 17 | 9/1/2002 | Employer's Remittance Report, August 2002 | Form 5500 Report: Massachusetts Laborers' Annuity Fund for plan year ending 6/30/2003 |

All in violation of Title 18, United States Code, Sections 1027 and 2.

COUNTS EIGHTEEN – TWENTY-THREE

SUBSCRIBING FALSE TAX RETURNS (26 U.S.C. §7206(1))

96.    The United States Attorney realleges and incorporates by reference paragraphs 1-8, 42-47, 50-62 and 76-78 of this Information, and further charges that:

97.    On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

MARY GILDEA,

defendant herein, did willfully make and subscribe Federal employment tax returns Form 941, Employer's Quarterly Federal Tax Return, for Lanco Scaffolding, Inc., for the periods set forth below, which were verified by written declarations that they were made under the penalties of perjury and were filed with the Director, Internal Revenue Service Center at Andover, Massachusetts, which said tax returns she did not believe to be true and correct as to every material matter in that on line 2 of each said tax return, total wages and tips plus other compensation were reported in the amounts listed, whereas, as she then and there well knew and believed, total wages and tips plus other compensation for each of the periods substantially exceeded the amounts reported:

| Count | Date | Reported Period | Wages and Compensation Reported on Line 2 |
|-------|------|-----------------|---------------------------------------------|
| 18 | 4/2/00 | 1st quarter 2000 | $ 145,018.85 |
| 19 | 7/17/00 | 2d quarter 2000 | $ 156,362.85 |
| 20 | 1/10/02 | 4th quarter 2001 | $ 230,429.00 |
| 21 | 4/15/02 | 1st quarter 2002 | $ 149,227.00 |
| 22 | 4/30/03 | 1st quarter 2003 | $ 162,816.40 |
| 23 | 7/8/03 | 2d quarter 2003 | $ 187,305.50 |

All in violation of Title 26, United States Code, Section 7206(1).

31

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

dated:  February 2, 2005

By: 
PAUL G. LEVENSON
Assistant U.S. Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3147