# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 05-10022 |
| CARLOS GOMEZ and | ) |
| MARY GILDEA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' SENTENCING MEMORANDUM

Defendants Carlos Gomez ("Gomez") and Mary Gildea ("Gildea"), husband and wife,

(collectively, the "Gomezes" ) submit this Sentencing Memorandum along with a video

concerning the Defendants' business and charitable activities, favorable letters from two of the

victims, reports from experts regarding the impact of the "loss" to the victims, and 63 letters of

support in connection with their sentencing hearing scheduled for September 27, 2005.[1]

---

[1] The following documents are submitted herewith:
· Exhibit A: transcript of a video containing interviews regarding the Gomezes' business and charitable activities (copies of the video, in DVD format, were hand-delivered to the Court, Probation, and Paul G. Levenson, A.U.S.A.), and Lanco Scaffolding, Inc. brochure;
· Exhibit B: 25 letters concerning the Gomezes' charitable contributions to the Andover School of Montessori;
· Exhibit C: personal and character letters;
· Exhibit D: letters concerning Lanco business;
· Exhibit E: letters from clients of Lanco;
· Exhibit F: letter from Daniel P. McGrath, C.P.A. of May 11, 2005;
· Exhibit G: letter from Norman Goodman, principal of Premium Review Associates of July 7, 2005;
· Exhibit H: letter from Paul McNally, Business Manager, Laborers' Union of July 7, 2005;
· Exhibit I: letter from Mr. McGrath of July 7, 2005;
· Exhibit J: letter from Mr. McNally of June 9, 2005;
· Exhibit K: letters from two Lanco employees;
· Exhibit L: letter from Harry R. Dow, Executive Director, Carpenters' Union of July 6, 2005;
· Exhibit M: letters concerning the Gomezes' other charitable contributions;
· Exhibit N: evidence of restitution to Liberty Mutual;
· Exhibit O: letter from Harry R. Dow of April 19, 2005, with Settlement Agreement;
· Exhibit P: letter from Diana Dadoly, Office Manager, Carpenters' Union of June 10, 2005;
· Exhibit Q: evidence of tax payments;
· Exhibit R: Declaration of James M. DiGiulio, Esq. of March 9, 2005, with attachments A-H;
· Exhibit S: letter from James M. DiGiulio, Esq. of May 4, 2005; and
· Exhibit T: letter from Barry P. Wilson, Esq. of May 2, 2005.

The Gomezes also filed a Downward Departure Motion based on the arguments contained herein.

This case is quite unique and extraordinary. The offenses in question were committed while the Gomezes were in the process of building a small business that has become the cornerstone of dozens of lives and that will not survive without their sustained personal attention. The tremendous support the Gomezes have received from their employees, clients, competitors, neighbors, and various charitable institutions, is indicative of their significant past contributions to the community and their value to society going forward. Moreover, there is extensive evidence that the "loss" calculated according to the advisory Sentencing Guidelines substantially overstates the actual impact of the Gomezes' conduct. The Gomezes are genuinely remorseful, committed to repaying all their obligations, continuing their lifelong commitment to charitable works, and providing employment to numerous hardworking individuals. While the Government may mechanically follow the now advisory Guidelines in its recommendation, this Court should consider the full range of sentencing factors set forth in 18 U.S.C. § 3553 and conclude that the proposed sentence is appropriate under either the statute or as a departure from the Guidelines. Under any sentencing system that takes into account the goals of deterrence, punishment, rehabilitation and restitution, in view of the overall good of society, it would be appropriate to sentence this married couple with three school aged children to the strict probation terms described below. More important still, it is the right thing to do.

## INTRODUCTION

Mr. Gomez founded Lanco Scaffolding, Inc. ("Lanco") in 1984, and has spent the last twenty-one years of his life building and managing the business. Today, it is an industry leader and called upon by major contractors like Payton Construction Co. and Shawmut Design and

Construction to perform difficult, challenging, large-scale and specialized scaffolding jobs throughout Massachusetts. Ms. Gildea joined the company in 1992, and helped grow it from only a few employees to twenty-three, in addition to the Gomezes. Despite the scope of the business, it is still a "mom and pop" operation. Together, the Gomezes handle all the managerial and operational job duties (including sales, contracting, training, management, and operations). They are the only ones with the training, knowledge, skill, experience and customer relationships necessary to operate it on a daily basis and they devote considerable amount of their time and effort to this rapidly growing company. Simply put, they are indispensable to Lanco.

The violations essentially stem from the payment of certain workers under-the-table and the resulting improper accounting and payroll practices. The charges involve the underpayment of workers compensation insurance premiums to two companies, underpayments to two union pension funds, and the underpayment of certain federal withholding taxes. This practice began on a very small scale and increased over the years as the company grew. The Gomezes' primary motivation for maintaining payroll off-the-books was to provide employment for Mr. Gomez's fellow immigrants, many of whom, unfortunately, lacked green cards. Over the past twenty years, Lanco has provided a steady source of work for dozens of hardworking immigrants.

Though the Gomezes' conduct resulted in a "loss" to the victims, their respective out-of-pocket losses are far less than the loss as strictly calculated under the Guidelines. The company's safety record is truly extraordinary. Indeed, neither of the two insurance companies to which the Gomezes underpaid premiums suffered *any* out-of-pocket losses from their conduct. To the contrary, both made profits. Similarly, the Unions' out-of-pocket loss is roughly one-fifth the "loss" under the Guidelines. As discussed below, the Guidelines loss calculation substantially overstates the seriousness of the Gomezes' offense.

3

The Gomezes acknowledge that their conduct was wrongful and they have already taken numerous, substantial steps to rectify their mistakes. To date, they have made over **$2,262,175** in restitution payments and are actively cooperating with the Laborers' Union to conclude a restitution agreement. Though this has certainly strained their operation financially, Lanco has adequate capital, and sufficient contract backlog and assets, to make full restitution, and the Gomezes are committed to doing just that. In addition, all of Lanco's workers are now registered union members, and their wages are reported properly to all appropriate entities.

The Gomezes recognize that they must be punished. However, the success of Lanco is completely dependent upon the Gomezes' day-to-day participation, and any significant period of incarceration will cause the business to close, compromise their ability to satisfy their remaining restitution and tax obligations, wreak economic devastation on the livelihoods of Lanco's 23 long-term employees and their many dependents, and inflict irreparable damage to the lives of the Gomezes' three young children, a 10 year old daughter and 8 year old twins, a boy and a girl.

Whether considered in light of the now-advisory United States Sentencing Guidelines, see United States v. Booker, 543 U.S. ---, 125 S.Ct. 738 (2005), after applying the downward departures to which the Gomezes are entitled or, more appropriately, pursuant to the sentencing factors enumerated under 18 U.S.C. § 3553(a), which requires courts to consider, *inter alia*, the "nature and circumstances of the offense" and the "history and characteristics of the defendant," the Gomezes' respectfully submit that the following sentence is fair and just for each of them: a period of five years' probation, with the following special conditions: a) a period of eight months' home detention; b) full compliance with a restitution schedule with the Laborer's Union as approved by the Court; c) full cooperation with the Internal Revenue Service in calculating any additional taxes owed by Lanco and/or the Gomezes; d) participation in a community service

plan involving Habitat for Humanity as approved by the Court; and e) payment of a $10,000 fine each.[2]

Alternatively, to the extent that the Court deems it necessary to impose some period of incarceration, the Gomezes jointly request that Carlos Gomez be directed to serve eight months in a half-way house and that Ms. Gildea be permitted to serve eight months in home detention, and that all of the other sentencing terms discussed above also be imposed. This will achieve the effect of punishing Mr. Gomez, the person who initiated the problem, with a period of incarceration, while allowing Lanco to remain a viable business operation and source of employment for 23 co-workers. It will also avoid traumatizing the Gomezes' three innocent young children with the loss of both parents to lengthy periods of incarceration.

The proposed sentences will still impose significant restrictions on the Gomezes' freedom.  The Gomezes submit that society's interests are best served by fashioning a sentence that allows them to insure that Lanco continues as a viable economic enterprise so that they can satisfy their remaining restitution obligations, provide a legitimate source of livelihood for their workers and their many dependents, and provide economic and emotional support to their three children.  In addition, given the low likelihood of recidivism, society will be better served if the Gomezes can put their substantial skills and personal qualities to use in community service rather than being warehoused, unproductively, in a penal institution for any lengthy period of time.

---

[2] Habitat for Humanity is a non-profit organization dedicated to constructing homes and shops in low-income neighborhoods.  The Gomezes have provided scaffolding installation services and materials for the Habitat Blue Hill Place construction project in 2004.  See infra p. 36; Ex. M, Letter from David Lopes to Judge O'Toole of April 12, 2005, and Thomas Grillo, *Blight Flight: Habitat brings housing and commerce to long-vacant lot*, October 18, 2003. Their community service would consist of providing a specified range of scaffolding services and materials to support similar Habitat projects.

## LEGAL BACKGROUND

On March 29, 2005, the Gomezes pled guilty to an Information alleging one (1) count of Conspiracy (18 U.S.C. § 371), eleven (11) counts of Mail Fraud (18 U.S.C. § 1341), and five (5) counts of ERISA False Statement (18 U.S.C. § 1027). Ms. Gildea additionally pled guilty to six (6) counts of Subscribing False Tax Returns (26 U.S.C. § 7206(1)).

The Plea Agreements signed by Mr. Gomez and Ms. Gildea on December 13 and 8, 2004, respectively, before the Supreme Court's decision in Booker, each provide that the Gomezes can argue that the Sentencing Guidelines are unconstitutional. Alternatively, the Plea Agreements permit the Gomezes to argue that the Sentencing Guidelines may serve as a guide to the Court but cannot constitutionally bind the Court's sentencing determination. Accordingly, although the Gomezes and the Government agreed to certain preliminary Sentencing Guideline calculations, they did so with the express caveat that these calculations were agreed to only: "[T]o the extent that sentencing in this case is, or may be, controlled or guided by the United States Sentencing Guidelines...." Plea Agreements ¶ 3(a)-(c).

Subject to this reservation, the Plea Agreements provide that the parties agree that the base offense level for Counts 1(b)-(c) and 2 through 17, is 7 pursuant to U.S.S.G. § 2B1.1(a), and that there is an 18 level increase in the base offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(J), based on a "loss" range of between $2,500,000 and $7,000,000. The base offense level for Count 1(a) and, as to Ms. Gildea, Counts 18 through 23, is 20, pursuant to U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1, based on a tax loss of more than $400,000 and less than $1,000,000. Pursuant to the grouping rules of U.S.S.G. § 3D1.4, this results in a combined adjusted offense level of 26 and a total offense level of 23, after the agreed-upon 3 offense level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. This results in a guideline range of

46-57 months imprisonment, assuming a criminal history category of I and prior to applicable

downward departures.[3] Significantly, the Plea Agreement explicitly permits the Gomezes to

move for downward departures from the Sentencing Guidelines for each of the reasons set forth

herein. See Plea Agreements ¶ 3(h).

## FACTUAL BACKGROUND

### I.    Defendant Carlos Gomez

Carlos Gomez was born in 1952 in Monterico, Guatemala. He was one of seven children

and his family subsisted under difficult conditions. His father, an alcoholic, worked as a taxi

driver and his mother cooked food for tourists in a hut on a local beach. Mr. Gomez and his

siblings were split up at a young age and sent to live in surrounding villages with family friends

so they could attend school. Mr. Gomez completed the equivalent of a 5th grade United States

education  at which time he left school to work and help support his family. Gomez Presentence

Report ("PSR") ¶¶ 101-03.

Mr. Gomez legally entered the United States in 1971 and moved to Chicago, Illinois. He

worked for a scaffolding company, earning $12 a day. In 1979, he moved to Massachusetts and

continued to work in the scaffolding industry. In 1984, Mr. Gomez formed Lanco, located in

Somerville, Massachusetts. Gomez PSR ¶¶ 104-06, 130. He has never collected unemployment

benefits, social security income or disability benefits or any form of public assistance. Id. From

the start, most of Lanco's workers were fellow immigrants from Guatemala or El Salvador. Mr.

Gomez was contacted by many such immigrants eager, and often desperate, to support their

families in the United States and back in their native countries and willing to perform hard and

dangerous work. Many of them did not have green cards. Mr. Gomez found it difficult to turn

---

[3] As discussed below, Ms. Gildea objects to Probation's calculation of her criminal history category as II, resulting
in  a Guideline imprisonment range of 51-63 months. Alternatively, Ms. Gildea moves for a downward departure

these people away and often hired them to perform various odd jobs at first and then trained them to perform scaffolding work.

Lanco was originally a non-union company, but as it grew in size and visibility, Mr. Gomez was essentially forced to unionize. He entered into his first Collective Bargaining Agreement ("CBA") with the Laborer's Union in 1986. The CBA contained an "evergreen provision" that resulted in the agreement automatically renewing on a yearly basis. Mr. Gomez, with his limited schooling and ability to read English, did not have legal counsel to advise him in his negotiations with the Laborers' Union or to interpret the far reaching potential civil and criminal implications of the agreement, especially those at issue here. He also effectively had no choice but to enter into this agreement (or be forced out of business) as there was mounting pressure to unionize. Unfortunately, many of Lanco's workers could not actually qualify for union membership because they did not have green cards. It was for this reason that Mr. Gomez began the practice of not reporting wages, or paying taxes, for those workers. Mr. Gomez was faced with a dilemma: either comply with his legal obligations and fire his friends and fellow immigrants, effectively ending their ability to support themselves and their dependents, or pay them off the books so they could continue to support their families. He chose to help his workers and their families.

Lanco specializes in complex, large-scale scaffolding projects. Some recent projects of note include scaffolding for construction at the Moakley Federal Courthouse (the names of several Lanco employees appear on the dedication to the Courthouse in the lobby), Fenway Park, the State House, The Fleet Center, numerous downtown Boston high-rise office buildings and various church steeples, including steeples at Boston College. Gildea PSR ¶ 124. See also Ex. A, Lanco brochure. Lanco currently employs 23 workers full-time, in addition to the

---

from criminal history category II to criminal history category I, pursuant to U.S.S.G. § 4A1.3(b)(1).

Gomezes. Most of these individuals are long-time employees with no job experience other than Lanco. The following is a list of current employees (many of whom are brothers), their length of employment at Lanco and their direct dependents:

|     | Employee | Years at Lanco | Dependents |
|-----|----------|----------------|------------|
| 1.  | Candido Castenada | 7 | wife and two children |
| 2.  | Hector Castenada | 11 | n/a |
| 3.  | Luis Umansor | 19 | wife and ten children |
| 4.  | Kendal Moran | 18 | wife and two children |
| 5.  | Roberto Gomez | 20 | wife and five children |
| 6.  | Fernando Gomez | 20 | wife and two children |
| 7.  | Jose Romero | 17 | wife and two children |
| 8.  | Pedro Romero | 13 | wife and two children |
| 9.  | Wilfredo Romero | 9 | wife and supports many family members |
| 10. | Nery Ortiz | 15 | wife and four children |
| 11. | Eleazar Ortiz | 16 | wife and two children |
| 12. | Oscar Ortiz | 6 | wife and three children |
| 13. | Cesar Ortiz | 3 | wife and three children |
| 14. | Carlos Perlera | 5 | n/a |
| 15. | Luis Perlera | 11 | wife and three children |
| 16. | Manuel Perlera | 8 | n/a |
| 17. | Ubencindo Perlera | 4 | mother, wife and three children |
| 18. | Jose Perlera | 4 | n/a |
| 19. | Wilson Perlera | 2 | single |
| 20. | Mario Gutierrez | 5 | wife and two children |
| 21. | Jose Pleitez | 3 | brother in El Salvador |
| 22. | Francisco Pleitez | 10 | wife and five children |
| 23. | Marcos Lima | 10 | wife and two children |

As evidenced by their statements contained on the video, see Ex. A, many of these employees also support extended family members back in Guatemala and El Salvador. See infra p. 29-30. Lanco's demise would have a devastating impact on these employees and their extended families. See id..

This is not the case of an individual who underreported obligations for purely selfish, personal financial gain. Rather, through his actions, Mr. Gomez created and grew a company that provides living wages for numerous workers and their families. As amply demonstrated in

the video, Lanco has been a lifeline for many of these men and their families. This is one of those rare cases where the offenses were committed in the service of a greater good, to provide decent wages to men willing to put in hard and dangerous work to support their families. To be clear, Mr. Gomez does not suggest that this excuses his conduct. However, it does place that conduct in its true context. In contrast to most crimes that do nothing but harm society, Mr. Gomez committed these offenses in the course of creating jobs and opportunities for numerous fellow immigrants and their dependents. Unlike most violators, Mr. Gomez was trying to do good and he did so, albeit in the wrong way. He should be judged and sentenced accordingly.

## II.    Defendant Mary Gildea

Mary Gildea was born in Wilmington, Delaware in 1957. She was also one of seven children. Ms. Gildea graduated from high school in Delaware in 1975 and took courses in nursing and chemistry at the University of Delaware between 1975 and 1979, when she left without completing her college degree. Aside from a brief period of military service, Ms. Gildea has worked full-time since leaving college. She has never collected unemployment benefits, social security income or disability benefits or any form of public assistance. Gildea PSR ¶¶ 96, 120, 124, 127.

Ms. Gildea moved to Massachusetts in 1986. She was working for LVI Environmental Services, Inc., an asbestos removal company, as the operations/office manager in 1989, when she met Mr. Gomez at a job site. They dated for several years and married in October 1992. Gildea PSR ¶¶ 96, 107. Ms. Gildea began working at Lanco when Mr. Gomez was wrongly incarcerated.   See infra pp. 46-47. The company had fallen into chaos during Mr. Gomez's absence and the workers were immobilized with confusion. Ms. Gildea learned that the books were in disarray and that certain of the workers were being paid "off the books." Ms. Gildea was

10

faced with the same dilemma. She could either advise her husband that he must terminate all employees without a green card, effectively reducing them and their dependents to poverty, or she could continue the practice in place, allowing the workers to continue to support themselves and their families. She too chose to stand by the workers.

This decision weighed heavily on Ms. Gildea over time, as she assumed full-time responsibility for all of Lanco's record-keeping. This unfortunate situation was not one she created; rather, she had inherited it as part of her marriage. In essence, by marrying Mr. Gomez and assuming responsibility for managing his business affairs, Ms. Gildea became married to the entire Lanco family of workers and their dependents. Although she does not suggest that this excuses her conduct, in order to keep the workers employed, Ms. Gildea was required to continue various accounting practices to avoid detection by various auditors.

This situation troubled Ms. Gildea, who understood she was violating the law, but saw it as the lesser of two evils, not of her making. She felt trapped and could not see a way out for the Company and its employees. If she suddenly reported all the workers actually on the payroll, it would expose those employees who were without green cards and who were not eligible for union membership. It would also subject the company to legal jeopardy. Moreover, if she merely placed on the official payroll and union rolls all employees who were here legally, those workers would make less money than before, due to added withholdings for income taxes and union contributions. This would result in the further anomaly that the most experienced workers with the greatest seniority, who were more likely to have green cards, would receive lower pay than the less-experienced, non-green card employees paid off the books.

Although Ms. Gildea agonized over this situation, she could not find a solution. She has described the instant case as a blessing in disguise, because it lifted a heavy burden from her

shoulders. Indeed, when the federal agents arrived to execute the search warrant, Ms. Gildea actually thanked them for bringing her dilemma to an end.

## III.   The Gomez Family

Ms. Gildea and Mr. Gomez are an extremely close, devoted couple. They have lived and worked together virtually 24 hours a day for the past 13 years. Ms. Gildea also recognized Mr. Gomez's alcohol problem early in their relationship and through her support, he has been sober for the past fourteen years. See Gomez PSR ¶ 123. They have three small children, Greta, who is ten, and twins, Samuel and Olivia, who are eight. Id. ¶¶ 109-11. As demonstrated by the video and numerous reference letters submitted on the Gomezes behalf, they are extraordinarily devoted to their children's education and are heavily involved in the Andover School of Montessori that their children attend. See Exs. A, B. Both Mr. Gomez and Ms. Gildea have made substantial contributions, not just of money, but of time and sweat equity, in the development of the school in numerous ways that benefit not just their children but the school as a whole. The many heartfelt testimonial letters and the statements of Joan Ellis, Art Teacher at the Andover School of Montessori, contained on the video, illustrate the unique personal contributions Mr. Gomez and Ms. Gildea have each made to the success of the school and the profound impression their devotion has made on the administration and teachers at the school. Ms. Ellis' statements perhaps best demonstrate this point:

> I'd like to share with you some of the things that Carlos and Mary have provided to our school, both material goods as well as inspirational pieces to add to the programs....What's important to know is that Carlos comes and works at the school. He installs the swing sets, he rakes the bark mulch, he helps put the benches and all of the things that are necessary to keep the programs running, outside and inside....*[The Gomezes] are the heart and soul of this school* and they continue to advocate for not just their own children but all of the children and staff as well....Many people in this school community...don't know all the stuff [the Gomezes] have done to contribute. They don't want to be highlighted....Their focus is on people and the things in their life.

Ex. A, Transcript pp. 12-14 (emphasis added). These efforts on behalf of the entire Montessori school family speak volumes about the kind of caring people the Gomezes truly are. See also Exs. B, C; infra pp. 34-37.

**IV.    Lanco Scaffolding, Inc.**

Lanco provides a livelihood for several members of the Gomez's extended family: his brothers Roberto, 50, and Fernando, 46, work at Lanco, as does his sister's husband, Kendal Moran and his nephew Carlos Lima. See Gomez PSR ¶¶ 95, 97. It also enables the Gomezes to financially support Mr. Gomez's mother, for whom they purchased a home in Guatemala, and to help support Roberto Gomez's 14 year old son who was diagnosed with *ataxia telangiectasia*, a lethal genetic disease that attacks children, causing progressive loss of muscle control, cancer, and immune system problems. Gomez PSR ¶¶ 94, 114. Roberto Gomez advised Probation that Mr. Gomez has been very generous to his family, providing the family with a special van and his son with a special bed and wheelchair. Gomez PSR ¶ 114.

The lengthy tenure of many of Lanco's employees, who basically consist of members of six different families, also speaks volumes about the type of company the Gomezes have created, the loyalty they have engendered in their employees and how crucial the continued success of Lanco is to the economic well-being of these employees. Lanco has been unusually loyal to these employees, providing them with work and wages (even if it entails doing odd jobs around the warehouse) throughout the year, contrary to the common industry practice of maintaining only a skeleton crew and calling on the union hall when additional day laborers are needed. Lanco's financial support of their workers during periods of scarce work saves them from reliance upon unemployment or welfare. In the past year, Lanco paid approximately $1.5 million in wages to these workers. As numerous employees have noted in their statements on the

video, the Gomezes have been extraordinarily generous to their employees, whom they treat
more like family members.  See Ex. A.  All of these individuals owe their success in the United
States to Carlos Gomez who, created Lanco out of nothing and Mary Gildea, who has helped
build Lanco to the successful business it is today.

Lanco completes approximately 150 projects each year.  Gildea PSR ¶ 124.  To obtain
these contracts, they must bid on more than 1,000 projects a year.  See id.  Most, if not all, of
those contracts are awarded based on Mr. Gomez's skills in evaluating, designing and pricing a
project and selling it to the customer.  Mr. Gomez has established an outstanding reputation in
the close-knit scaffolding and construction community in Massachusetts, based on his expertise
in designing and erecting scaffolding, his safety record and work ethic and responsiveness to
client's needs twenty-four hours a day.  He is the force and backbone of Lanco, and when
contractors hire Lanco they are, in reality, hiring Mr. Gomez.  The following comments from
Lanco's clients and business partners best reflect these points:

- Over the last 15 years, Carlos has always exhibited a professional work ethic and
pride in the services he has provided to numerous customers...Mr. Gomez has on
many occasions gone above and beyond the role as a business owner to help his
employees whenever possible regarding diverse problems they may face.  Ex. D,
Letter from Joseph R. Nogueira to Judge O'Toole of April 14, 2005.

- It is evident that the training [the Lanco employees] have received from Carlos
Gomez is of the highest quality as it relates to their consistent safety, ethics and
professionalism.  Due to the nature of their work...Lanco is always the first and last
representation of manpower that our company presents to our business clients.  They
always represent us in a highly professional manner.  The bottom line is...Lanco
Scaffolding has always presented to us a group of hard working, exceptionally well
trained, courteous, and just plain good people.  Ex. E, Letter from William F. Whall
to Judge O'Toole of April 15, 2005.

- I have known Carlos Gomez and Lanco Scaffolding, Inc. for over 20 years...During
this long period of time I have been favorably impressed with Carlos and his
company....I can only conclude that the consistency [of the employees] was directed
from the top and covered all aspects of his company.  Ex. E, Letter from Evan L.
Hankin to Judge O'Toole of April 26, 2005.

Mr. Gomez's job duties at Lanco are best summarized as follows:

> He arrives every day at the warehouse at approximately 5:00 am and readies everything for the crews - the daily schedule is set the night before by Ms. Gildea with his input (as explained below). The crew arrives at 6:30 and he reviews the specs for each job with every crew member. The teams are then driven to the various jobs sites by the company. With the exception of the crew leaders…most employees do not drive.

> Mr. Gomez is primarily responsible for designing and laying out each job. To do this, he draws from over 30 years of experience in the industry. Among other things, he designs the scaffolding structure and determines equipment usage and "tie off" procedures, which vary from job-to-job. He also is the exclusive trainer for scaffolding erection and safety.

> Everyday Mr. Gomez tries to visit each job site to oversee progress and safety. Every evening, he uses information from these visits to assist Ms. Gildea in ascertaining job needs and staffing/scheduling for the next day. Between job site visits, he meets with existing and potential customers to review new projects, make sales pitches, deliver estimates, and address all necessary issues arising in the field. He works closely with Mr. Moran to generate competitive estimates because he is the only individual in the Company capable of assessing job scope, i.e. duration, design, equipment and labor needs, and safety.

> Occasionally, jobs must be completed during evening hours or on weekends. In those instances, if feasible, Mr. Gomez stays for the duration of the project(s) and works with the employees.

> Mr. Gomez handles "toolbox" safety meetings with his crews on a regular basis. Those meetings are to address any specific conditions on a job site that are unique and to ensure that all safety procedures are being followed on the job for the benefit of Lanco's employees as well as all of the trades working on, or in the vicinity of, the Lanco's scaffolding.

Ex. F, pp. 2-3.

Ms. Gildea's job duties at Lanco are best summarized as follows:

> She is responsible for all of the administration, accounting, billing, and management of the office. She arrives each day at approximately 9:00 am, after dropping her three children off at school. She then meets with Mr. Gomez to review daily scheduling, answers phones, addresses employee issues, summarizes payroll information for the payroll service, prepares progress bills, formalizes new job quotes and does the company's banking. She is the only person capable of performing these job duties and, other than Mr. Gomez and Mr. Moran, is the only other individual at Lanco who

> speaks English fluently. At the end of each day (i.e. after 7:00 pm), she prepares the work schedule for the next day with input on job progress from Mr. Gomez. If there are any special assignments, she contacts the employees that night and makes any arrangements necessary for them and/or the particular job.

Id. at 3.

It was Ms. Gildea who convinced Carlos to professionalize Lanco by renting office space in 1991; it was she who convinced him to transfer the office to a warehouse so they could better oversee the employees, and it was Ms. Gildea who stepped in to run Lanco when Mr. Gomez was wrongfully incarcerated in the early 1990s. See infra pp. 46-47. Given the integral role Mr. Gomez and Ms. Gildea play in the successful day-to-day operation of Lanco, incarceration of either of them for any significant period of time will cause the Company to go out of business and will leave its many employees without jobs to support their many dependents.

## ARGUMENT

In Booker, the Supreme Court held the Sentencing Guidelines to be advisory and reiterated the goal of achieving fair, balanced and proportional sentences. 543 U.S. ---, 125 S.Ct. 738 (2005). As a result, the now purely advisory Sentencing Guidelines are only one of numerous sentencing factors that courts must consider pursuant to 18 U.S.C. § 3553(a) in imposing sentence. Other factors of equal if not greater importance include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

. . .

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §§ 3553(a)(1)-(3), (7). In addition, 18 U.S.C. § 3553(a) directs sentencing courts to "impose a sentence sufficient, but not greater than necessary" to comply with the goals enumerated above. The factors discussed below, whether considered independently, or as well-recognized downward departures under the Sentencing Guidelines, support the sentences the Gomezes request.

## I. THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES BECAUSE THE LOSS CALCULATION SUBSTANTIALLY OVERSTATES THE SERIOUSNESS OF THE OFFENSE AND WOULD RESULT IN A GROSSLY UNJUST PUNISHMENT.

18 U.S.C. § 3553(a) requires sentencing courts to account for "the nature and circumstances of the offense" and "the need for the sentence imposed to reflect the seriousness of the offense" in determining a sufficient, but not greater than necessary, sentence. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). The loss calculation in this case is comprised of three components: 1) workers compensation insurance premiums underpaid to the Liberty Mutual Insurance Group ("Liberty") and Eastern Casualty Insurance Company ("Eastern") totaling $1,983,935; 2) underpayments to the Massachusetts Laborers' Benefit Fund ("the Laborers' Union") and the Carpenters' Benefit Fund ("the Carpenters' Union") (collectively, "Unions") totaling $1,954,679; and 3) federal income tax withholdings totaling $831,485. The Gomezes do not contest the $831,485 tax loss figure, although they note that they have already made a tax payment of $1,250,000 to satisfy this and any other yet-to-be-determined tax liabilities.

However, the loss calculations attributed to the workers compensation insurers and the Unions do not accurately reflect the severity of harm to those entities.[4] A more accurate gauge of the "seriousness of the offense" is the out-of-pocket loss sustained by those entities. Here, due the Lanco's extraordinary safety history, the Gomezes' actions actually resulted in *no* out-of-pocket loss to the workers compensation insurers, and only minimal potential out-of-pocket loss to the Unions.[5]

Under § 3553(a), the Court should consider this evidence in determining what type and length of sentence would be "sufficient, but not greater than necessary," to satisfy the purposes of sentencing.[6] United States v. Pimental, 367 F.Supp.2d 143 (D. Mass. 2005) (Gertner, J.) is an analogous case. In Pimental, the defendant, owner of a small construction business, was convicted of two counts of mail fraud arising from his underpayment of workers compensation insurance premiums. The Government sought to sentence Mr. Pimental at the upper end of the Guideline range of 27-33 months, based upon a loss calculated by the difference between insurance premiums owed and premiums paid (approximately $500,000). Judge Gertner rejected the Government's loss calculation, noting that there were no claims paid and, therefore, "[n]o *actual loss* resulted from the [defendant's] misrepresentation," and sentenced Mr. Pimental, for this and other reasons, to probation. Id. at 155-157 (emphasis added). As in Pimental, the loss calculation under the advisory Guidelines is not a reasonable and fair basis for imposing a

---

[4] The Gomezes do not challenge the accuracy of the "loss" amounts in the Plea Agreements they signed; rather, they contend that those figures do not properly reflect the impact of their conduct upon the victims in this case. Indeed, each Plea Agreement permits the Gomezes to challenge the guideline calculation, *inter alia,* on the ground that the loss overstates the seriousness of the offense.

[5] At this time, any liability for which the Unions would be responsible to their members is still prospective. See infra pp. 17-24.

[6] Furthermore, to the extent this Court looks to the advisory Guidelines in imposing a sentence, a downward departure is warranted because the calculation of loss substantially overstates the seriousness of the offense and results in a grossly unjust punishment. U.S.S.G. § 2B1.1, n.19(c); see infra pp. 17-24.

18

sentence in this case. The more equitable barometer for punishment in this case is the victims'
out-of-pocket losses.

Similarly, in United States v. Tobin, 28 F. Supp. 2d 674 (D. Mass. 1998) (Young, J.), a
pre-Booker case, the court held that "loss" for purposes of restitution in a workers compensation
fraud case is determined by "amount of the claims paid...*not* by the amount of the premiums
withheld." Id. at 677 (emphasis added). The Tobin court further held that "[E]xpectancy
damages [i.e., premiums withheld] are not the equivalent of monetary loss." Id., n.4.

### A. The Workers Compensation Insurance Companies Suffered No Out Of Pocket Losses And Actually Profited From Lanco.

The Gomezes do not dispute that they underpaid approximately $801,059 in workers
compensation premiums to Liberty Mutual Insurance Company and $1,182,876 in insurance
premiums to Eastern Casualty Insurance Company. However, neither of these insurance
companies suffered any out-of-pocket losses as a result of these actions. Indeed, the companies
made a combined profit of over $200,000 from Lanco's business, even with the underpaid
premiums. In addition, the Gomezes have already made full restitution to Liberty Mutual of
$866,992 in premiums. Ex. N. Eastern Casualty is no longer in business.

A detailed analysis of the loss to the workers compensation insurers was completed by
industry expert Norman Goodman, founder and principal of Premium Review Associates, a
company that specializes in evaluating workers compensations policies, and retained by the
Gomezes in this case. See Ex. G. After a thorough review of the relevant insurance policies,
payrolls, and other relevant documents, Mr. Goodman concludes that the workers compensation
insurers sustained *no* out of pocket *loss* (i.e., premiums paid − [claims paid + administrative
expenses]) and, in fact, made an estimated *profit* of **$218,093**. Because of the extraordinary
safety record of Lanco, the insurers during the relevant time period have only had to pay two

19

claims totaling $59,266.[7]  While the definition of "loss" in the advisory Guidelines technically

allows for a calculation based on foreseeable or expectancy damages for sentencing purposes, the

Pimental and Tobin methodology, which is reflected in Mr. Goodman's report, is a much more

equitable measurement for punishment in this case.  This argument bears even greater weight

given the dramatic discrepancy between the advisory Sentencing Guidelines workers

compensation loss of $1,983,935, based on unpaid insurance premiums, and the out-of-pocket

loss ($0).  See U.S.S.G. § 2B1.1, cmt. 3.  In essence, the Gomezes should not be forced to endure

a far lengthier jail sentence because insurance companies failed to realize an additional

$1,983,935 in profits off Lanco.

    B.  The Loss Calculation For The Unions Also Substantially Overstates The Seriousness Of The Offense Because The Unions Were Not Responsible To Their Members For Certain Portions Of The Unpaid Remittances, And They Are Not Liable To Those Lanco Employees Who Were Not Union Members.

The $1,660,259 and $294,420 loss calculations under the advisory Sentencing Guidelines

with respect to the Laborers' and Carpenters' Unions, respectively, also substantially overstate

the seriousness of the offense.  Strictly applying the CBAs, the loss was calculated as follows:

(1) union remittances, based on Lanco's Union members' unreported hours; plus (2) remittance

based on all hours worked by all Lanco's non-Union employees.

This calculation substantially overstates the loss with respect to the first category of

employees described above because the Unions are not responsible to their members for certain

portions of the unpaid remittances (e.g., Health and Welfare and Annuity contributions), which

in this case substantially reduces the Unions' exposure.  This has been affirmed by the Laborers

Union, in its victim impact statement submitted to Probation by Thomas Masiello received by

the Probation Office on May 12, 2005, in which Mr. Masiello states:

---

[7] See infra 17-24.

> There are no requirements that participants [i.e., Union members] be credited for
> Health and Welfare Fund coverage if the contributions are not received and…[t]here
> is no definitive rule by the Internal Revenue Service yet as to whether or not laborers
> must be credited for Annuity Fund contributions not received….As a result, laborers
> will lose Annuity Fund contributions which were not made by Lanco Scaffolding,
> Inc.

Gomez PSR ¶ 46. Thus, the actual harm to the Unions, fairly measured by the potential liability

of the Unions to its members, is much lower than the advisory Guidelines figure.[8]

The calculation also substantially overstates the loss with respect to the second category

of employees described above, because the Unions are not liable to those employees who were

*not* Union members. See Ex. H ("Laborers Union is not responsible to Lanco's employees who

were not members of the Union for any unpaid remittances").

Daniel P. McGrath, a Certified Public Accountant retained by the Gomezes for this case,

analyzed the Laborer's potential exposure to its members and concluded it to be **$315,104.04**.

Ex. I. This calculation excludes those amounts for which the Union has no responsibility to its

members (as confirmed by Mr. Masiello, Gomez PSR ¶ 46) and excludes amounts based on non-

Union Lanco employees for whom the Union has no liability (as confirmed by Mr. McNally,

Ex. H). The resulting figure comprises the Union's potential out-of-pocket liability to Lanco

employees who were Union members, and who were paid some, or all, of their wages under the

table. Id. A similar calculation of the Carpenters' potential exposure results in a figure of

**$112,540.90**. Id.

These loss figures are also consistent with the statement of Mr. McNally regarding the

Laborers' loss:

> While I understand how the latter [Guidelines] figure ($1.6 million) was calculated,
> and that technically it may be correct, I respectfully submit that the former number

---

[8] See United States v. Bruckman, 874 F.2d 57, 63 (1st. Cir. 1989) ("the sentencing judge may properly consider victim impact information concerning financial losses of victims").

($315,104.04) is a far more accurate barometer of the impact of Lanco's actions on the Union. I say this because the $315,104.04 figure accounts for two important facts: first, Laborers' Union is not responsible to Lanco's employees who were not members of the Union for any unpaid remittances; and second, even for those employees who were members of the Union, the Laborers are not responsible to them for a majority percentage of unpaid remittances (as explained in the letter from Thomas Masiello, Administrator of the Massachusetts Laborers' Benefit Funds, which was submitted to the Probation Office on May 12, 2005). Accordingly, I respectfully ask that $315,104.04 be considered the "loss" to the Union for the purposes of determining a sentence in this matter because this calculation appropriately backs-out remittances not due to non-Union members and the share attributable to uncollectible Heath and Welfare and Annuity Funds.

Ex. H. Thus, as the chart below demonstrates, there is a significant disparity between the loss calculated under the advisory Guidelines and the true "impact" on the victims..

| CALCULATION OF LOSS | | |
|---|---|---|
| | **Guidelines Calculation** | **Defendants' Calculation**[9] |
| Liberty Mutual Insurance Group | $801,059.00 | $0 |
| Eastern Casualty Insurance Company | $1,182,876.00 | $0 |
| **Total Loss to Workers Compensation Insurers** | **$1,983,935.00** | **$0** |
| | | |
| Massachusetts Laborers' Benefit Fund | $1,660,259.00 | $315,104.04 |
| Carpenters' Benefit Fund | $294,420.00 | $112,540.90 |
| **Total Loss to Unions** | **$1,954,679.00** | **$427,644.94** |
| **Total Fraud Loss**[10] | **$3,938,614.00** | **$427,644.94**[11] |

C. The Gomezes' Proposed Sentence Is Warranted Because The Loss Calculation Does Not Accurately Reflect The "Nature And Circumstances" Of The Offense Under 18 U.S.C. § 3553(a).

The nature and circumstances of this case weigh heavily in favor of imposing a sentence far below the Guideline ranges referenced in the Plea Agreements. When considered in light of 18 U.S.C. § 3553(a)(1), the offenses to which the Gomezes pled guilty do not warrant such a

---

[9] The Gomezes submit this loss should apply for any departure purposes as well.

[10] In addition, the Plea Agreements provide for a total *tax* loss of $831,485, for a total combined loss of $4,770,099

severe sentence. The insurance companies suffered no out-of-pocket losses and the Unions

suffered far lower potential, if any, losses. The Gomezes should not be treated for sentencing

purposes in the same manner as someone who, for example, stole, embezzled or received a

fraudulent claim payment of $4 million dollars from insurance companies or unions. The

financial impact on these entities is dramatically less severe than the Guideline "loss" figure

would suggest and the Gomezes' sentence should be reflect the far less serious nature and impact

of their offense conduct. Simply put, the Gomezes should not be punished more because the

insurance companies and unions did not profit *more* from their dealings with Lanco; rather, they

should only be punished for the out-of-pocket losses they in fact caused.

### D. The Advisory Sentencing Guidelines Also Permit A Downward Departure Where The Loss Substantially Overstates The Seriousness Of The Offense.

To the extent that this Court considers the advisory Guidelines in imposing a sentence, a

downward departure is warranted based upon the evidence described above. The Guidelines

explicitly permit a downward departure where the calculation of loss substantially overstates the

seriousness of the offense and would result in a grossly unjust punishment. U.S.S.G. § 2B1.1,

n.18(c). The Guidelines reasonably anticipated that some fraudulent misrepresentations are

inherently more egregious than others. See Pimental at 156 ("[s]ignificantly, even the

Guidelines recognize that there are times that amount of loss overstates a defendant's

culpability"). The First Circuit has stated that:

> Precisely because the guidelines use amount of loss as a proxy for culpability in fraud cases, a supportable finding that the loss exaggerates the reality of events *often* is tantamount to a finding that the conventional sentencing range exaggerates a defendant's blameworthiness, and, thus, tends to invite a corresponding downward departure.

---

[11] This figure is reduced further if the $218,093 profit by the workers compensation insurers is subtracted, resulting in a total of $209,551.94.

United States v. Rostoff, 53 F.3d 398, 408-09 (1st Cir. 1995) (emphasis added) (affirming the sentencing court's determination in a bank fraud case that the "loss grossly overstate[d] the seriousness of the criminal activity").

    As stated above, the loss calculation under the advisory Guidelines is not a reasonable and fair basis for imposing a sentence in this case, because it does not accurately reflect the seriousness of the offense. The calculation of loss is designed to be a "measure of the seriousness of the offense and the defendant's relative culpability[.]" U.S.S.G. § 2B1.1, cmt. background. Here, given Lanco's outstanding safety record, there is no evidence that the Gomezes expected claims paid out would exceed premiums paid in. The unique circumstances of their case take it outside of the heartland of cases contemplated by the advisory Guidelines, creating a compelling rationale for a downward departure. Under either the now-advisory Guidelines or in light of the § 3553(a) factors, it is unfair to sentence the Gomezes to the same punishment that someone who was truly culpable of a $3,938,614 out-of-pocket fraud loss would receive. The true impact of the Gomezes' actions on the insurance companies and unions is far closer to $427,644.94 than $3,938,614.00. Substituting the lower loss figure reduces the specific offense characteristic two levels, from level 18 (losses more than $2,250,000 but less than $7,000,000) to level 14 (losses more than $400,000 but less than $1,000,000). This translates into a total offense level, after application of the grouping rules, of 20, rather than 23, with a corresponding guideline range of 33-41 months imprisonment before the additional departures discussed below.

**II.   THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND
THE ADVISORY SENTENCING GUIDELINES BECAUSE OF THE
CATASTROPHIC ECONOMIC IMPACT THAT A SENTENCE WITHIN THE
APPLICABLE GUIDELINE RANGE WOULD HAVE ON THE GOMEZES'
TWENTY-THREE (23) EMPLOYEES.**

The nature and circumstances of this case weigh heavily in favor of granting the proposed

sentence because of the economic hardship that would surely befall Lanco's employees if the

Gomezes are incarcerated.  The Gomezes perform *all* of the management and operational duties

for Lanco and are the only ones with the training, knowledge, skill, experience and customer

relationships necessary to operate the company on a daily basis.  If they are incarcerated, the

company will not be able to survive without them and will surely fail.  Moreover, the devastating

impact of the loss of jobs on the employees is surely beyond the scope of "just punishment" for

the Gomezes' offenses.

In addition, a downward departure is warranted if the Court imposes a sentence pursuant

to the now-advisory Guidelines.  The First Circuit has explicitly recognized that a reduced

sentence may be warranted when a defendant's incarceration would result in economic hardship

to innocent employees.  See United States v. Olbres, 99 F.3d 28, 36 (1st Cir. 1996).

In Olbres, the husband and wife defendants employed twelve people in their small New

Hampshire business.  Id. at 29.  The District Court found that, if the defendants were

incarcerated, their company would fail and its 12 employees would lose their jobs.  Although

Judge Steven J. McAuliffe stated before sentencing that he would have departed "in a manner

sufficient to keep the business from failing and putting those people out of work," he declined to

depart on these grounds because he mistakenly believed that the Sentencing Guidelines, as a

matter of law, prohibited downward departures to prevent the closing of an ongoing business and

the consequent loss of employment to its workers. Id. at 33. The First Circuit reversed, holding

that these consequences may indeed constitute grounds for downward departure. Id. at 34-36.

      The First Circuit analyzed the case according to the Supreme Court's decision in Koon v.

United States, 518 U.S. 81 (1996), which held that a sentencing court must ask four questions in

considering a departure from the guideline range: (1) What features of this case, potentially, take

it outside the Guidelines' "heartland" and make it a special, or unusual case?; (2) Has the

Commission forbidden departures based on these features?; (3) If not, has the Commission

encouraged departures based on these features?; (4) If not, has the Commission discouraged

departures based on these features? Id. at 95 (quoting United States v. Rivera, 994 F.2d 942, 949

(1st Cir. 1993)). The First Circuit found that, with respect to the risk of job loss to Mr. Olbres'

employees, the Sentencing Commission neither forbade, encouraged, nor discouraged departure

based upon this feature. Olbres at 35 ("It is clear that the Guidelines do not explicitly list the

factor at issue here among the forbidden or the discouraged factors."). Acknowledging that

"[t]he mere fact that innocent others will...be disadvantaged by the defendants' imprisonment is

not alone enough to take a case out of the heartland," the First Circuit stated that "these issues

are matters of degree, involving qualitative and quantitative judgments." Id. at 36. The First

Circuit remanded the case to the district court for consideration of such issues of "degree,"

whereupon the district court granted Mr. Olbres a downward departure and sentenced him to two

months in jail and eleven months community confinement, with restrictions designed to permit

him to conduct his business and preserve the jobs of his employees.[12] See also United States v.

Derbes, 369 F.3d 579, 583 (1st Cir. 2004) (ruling that where defendant is essential to a small

business and where employees might suffer if the company goes out of business, departure is a

possibility); United States v. Dethlefs, 123 F.3d 39, 46 (1st Cir. 1997) (holding that courts are

not foreclosed from the possibility of a downward departure where a defendant's incarceration would result in business failure and cause employees to lose their jobs); United States v. Milikowsky, 65 F.3d 4 (2d Cir. 1995) (affirming grant of one-level downward departure to antitrust violator because imprisoning the defendant business owner would cause extraordinary hardship to his employees); United States v. Morgan, No. 96 Cr. 200, 1996 WL 633993 (N.D. Ill. Oct. 29, 1996) (granting downward departure because it was unlikely that two of the companies associated with the defendant would remain in business if he were to be incarcerated); United States v. Crawford, No. 02 Cr. 894, 2003 WL 21518564, *3 (N.D. Ill. July 2, 2003) (departing down three levels because the defendants were "impossible to replace and critical to the continued operations" of the business and the "employment of its personnel").

The job loss and economic hardship that would result from sentencing the Gomezes to significant terms of incarceration is substantially similar to the economic hardship and job loss that the district court ultimately found sufficient in Olbres to justify a downward departure and a two-month imprisonment. Furthermore, where the downward departure granted in Olbres protected twelve employees, a downward departure here will protect at least twenty-three employees.[13] In addition, this case presents an additional factor not found in Olbres: most, if not all, of the Lanco employees are predominantly Spanish-speaking, with limited English-language skills, and if the company were to close they would have an exceptionally difficult time finding new employment.

---

[12] The district court had originally sentenced Mr. Olbres to 18 months incarceration. Olbres at 30.

[13] Mr. McGrath states that based upon his evaluation of Lanco, "[t]he Company anticipates a very busy summer and adding a number of new projects that were delayed because of the severe weather conditions this past winter. Mr. Gomez and Ms. Gildea report that they are looking to hire and train additional employees to handle Lanco's backlogged worked." Ex. F.

A. The Gomezes Are Indispensable To The Economic Survival Of Lanco.

As stated above, Mr. Gomez started Lanco in 1984 and has spent the last twenty-one years of his life building and supervising the business. As a principal of Lanco and representing the "public face" of the company, Mr. Gomez is an irreplaceable part of the company's continued viability. See Ex. F. Ms. Gildea joined Lanco in 1992 and helped substantially grow the company from only a few employees to twenty-three employees. She is responsible for all the administration, accounting, billing, and management of the office. Ms. Gildea's daily presence at Lanco's office is also critical to the company's operations, as she is the only person at the company capable of performing all the duties relating to the business within the office. See id. Under the Gomezes' guidance, Lanco has grown from a small scaffolding company to one of the most well-respected companies in the region. They have achieved this success through their unique hands-on involvement in the day-to-day operation of the company. That Mr. Gomez and Ms. Gildea are essential to the continued success of Lanco is reflected in the evidence from third parties with knowledge of Lanco's operations as follows:

- Paul McNally, Business Manager for the Laborers, states: "[B]ased on my 30 years of experience in the industry…Carlos and Mary are indispensable to Lanco: Carlos is the public face of the business and does all of the employee training; and Mary performs all operations and administration. *In my opinion, their incarceration would cause Lanco to close immediately.*" Ex. J. (emphasis added)

- Kendal Moran, Lanco employee, states: "Carlos and Mary are invaluable to Lanco Scaffolding. They are Lanco Scaffolding. They have taught us an art form and we are proud to know them and continue to rely on them each and every day….We are all very grateful for our jobs as our families are." Ex. K, Letter from Mr. Moran to Christopher Cunio of April 10, 2005.

- José Pleitez, Lanco employee, states: "[w]ithout this company we are nothing…because [this is how] we support ourselves…pay rent…and continue learning more each day." Ex. A, Transcript p. 9.

- Daniel J. McGrath, C.P.A., states: "Mr. Gomez and Ms. Gildea are indispensable to Lanco and their incarceration would result in the immediate closing of the Company and the layoff of all of its employees." Ex. F.

B. The Failure Of Lanco Would Have A Disastrous Impact On The Company's Employees And Their Families.

The Gomezes' employees rely on them and Lanco for their stable, well-paying jobs and highly-specialized training. Most of Lanco's employees have worked for the company for years and are highly dependent on Lanco. Should the company become defunct, these individuals will immediately lose those jobs and, given their limited English-language skills and the risk of discrimination, they will face severe difficulty in securing equally safe and well-paying employment. The loss of their jobs as a result of the Gomezes' prolonged incarceration would have a devastating impact, both financially and emotionally, upon these employees.

Lanco's employees are truly concerned about the potential loss of their jobs and about their well-being should the Gomezes be incarcerated for an extended period of time, as reflected in their video testimonials.

- Employee Wilfredo Romero: "I am very grateful to [Mr. Gomez] and I know he is the right hand of this company. Without him, well, we don't have the means to go on since from these wages I earn I support my mother, pay my car, pay my rent and I support a lot of people...This has been the [only] job I've ever had since I came from my country...I don't know any other work[.]" Ex. A, Transcript p. 5.

- Employee Pedro Romero: "[The Gomezes] have helped me with the child support situation....I have three children. They depend on me, on my work, on the work Mr. Carlos gives me....[W]e depend on him, on the work that he does. My whole family depends on the work he does." Id., pp. 4-5.

- Employee José Arístides Romero: "It was the first job I got and I have worked all this time at Lanco. [T]hanks to God and Carlos who has given me work, my family has been able to go on. I have a wife and two kids. My kids were born here. I also have my house, my car, what I live off of, of which everything depends on the job, the payments and everything I do depends on it." Id., p. 4.

- Employee Luis Mario Perlera: "I have two small children and without Mr. Carlos we can't live because without work one can not support oneself and he is a good

person....All our life he has had us working and without him the company would close and for our family if we don't have work how are [we] going to support our children?" Id., p. 8.

- Employee José Daniel Perlera: "[Mr. Gomez] helps us a lot, well, he gives us a hand and without him here we are nothing, well, because without him the company is nothing. And, well, thanks to this job we are doing well. We have the things we need[.]" Id., p. 9.

- Employee José Domingo Pleitez: "I support myself and my brothers that are in El Salvador. I help my family that's here and the one who are there and, mainly, without this company we have nothing either because from here is that we support ourselves and from here we pay the rent, each one of us[.]" Id., p. 10.

The catastrophic impact that Lanco's closing would have upon its employees is further reflected in the evidence from third parties with knowledge of Lanco's operations as follows:

- Mr. McNally states: "Carlos and Mary currently provide approximately 24 predominantly Spanish-speaking individuals with safe, well-paying jobs....Their employees, in turn, are able to support their family members and are proud, productive members of society. Lanco's closing would impose extraordinary hardship on these innocent employees and their families because they would immediately lose their jobs." Ex. J.

- Harry R. Dow, Executive Director of the Carpenters Benefit Funds, states: "Lanco is a stable employer that provides union workers, many of whom are minorities, with steady well-compensated employment....[I]f Lanco were to close, the result would be a significant loss to both union employees and workers." Ex. L.

It should also be noted that the continued operation of Lanco provides social and economic benefits to the community beyond simply job security, since many customers and members of the community are dependent on Lanco for the company's safe and reliable services in such a highly-specialized field. Mr. McNally emphasizes the Gomezes' long-standing commitment to employee training, stating that "over the past 20 years, Lanco has trained dozens of employees in the highly specialized field of scaffolding. There are precious few employers today which, like Lanco, invest the time, effort and expense to train their employees. Lanco's closing would eliminate an important source of worker training." Ex. J. Moreover, "Lanco's

closing would create a void in the industry and leave many contractors without a proven, reliable service provider." Id. The sentence proposed by the Gomezes achieves the purposes of punishment and rehabilitation while avoiding any further burdens on society should Lanco fail and its current twenty-three employees become jobless.[14]

## III.    THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES IN LIGHT OF THE DETRIMENTAL IMPACT THAT INCARCERATION OF THE GOMEZES WOULD HAVE ON THEIR YOUNG CHILDREN.

Section 3553(a)(1) directs sentencing courts to consider "the history and characteristics of the defendant" in determining a sufficient, but not greater than necessary, sentence. This requires the Court to take into account the Gomezes' unique family circumstances, which warrant a reduction in sentence. As detailed below, incarceration of the Gomezes would tear apart their close-knit loving household and have damaging repercussions throughout their immediate and extended family.

Further, even if the Court chooses to impose a sentence under the advisory Guidelines, a downward departure is still warranted on these grounds. Even before Booker, sentencing courts often granted downward departures when a defendant's family circumstances were unusual or "other-than-ordinary." See U.S.S.G. § 5H1.6; United States v. Sclamo, 997 F.2d 970, 973 (1st Cir. 1993) (ruling that extraordinary family circumstances may form a valid basis for downward departure from offense level of 17 to three years probation with six months home confinement); Rivera, 994 F.2d at 949 (1st Cir. 1993) ("[W]hen unforeseen circumstances arise, the district court will decide whether to depart...and, if so, how much...[u]ltimately, however, the Guidelines cannot dictate how courts should sentence in such special, unusual or other-than-ordinary

---

[14] The proposed sentence of 8 months home detention anticipates that the Gomezes will be permitted to continue to work at Lanco. However, given the inevitable limits such a sentence will impose on their freedom of movement and

31

circumstances."); United States v. Johnson, 964 F.2d 124, 125 (2d Cir. 1992) ("the United States

Sentencing Guidelines do not require [judges] to leave compassion and common sense at the

door to the courtroom"; granting 10-level reduction from offense level 23 based upon family

circumstances of defendant and 3-level reduction for other factors for ultimate sentence of six

months home detention).

The detrimental impact on the Gomezes' innocent children and other family members if

the Gomezes are incarcerated is a mitigating factor which weighs heavily in favor of a reduced

sentence in this case. See United States v. Lewis, 375 F. Supp. 2d 1, 3 (D. Mass. 2005)

(Harrington, J.) (in imposing an out-of-Guidelines sentence, the Court stated "[s]ince all

sentences relate to an individual human person, and not to a norm, a sentence must be shaped to

the individual defendant involved...the Court in imposing an appropriate sentence shall...full[y]

examin[e]...the individual defendant's *personal characteristics, family responsibilities*, medical

and mental condition, criminal record and the particular circumstances surrounding the crime")

(emphasis added). See also United States v. Jaber, 362 F. Supp. 2d 365, 376, n.21 (D. Mass.

2005) (Gertner, J.) ("Booker plainly allows courts to look carefully at those factors and to

determine to what degree they are relevant to individual cases"). See also 18 U.S.C. § 3661 ("no

limitation shall be placed on the information concerning the *background, character, and conduct*

*of [the defendant]* which the court may receive and consider for the purposes of imposing a

sentence.") (emphasis added).

As described above, not only would the Gomezes' incarceration cause a substantial and

direct loss of critical caretaking and financial support to their three young children, it would

result in irreparable damage and suffering to their entire extended family. See supra pp. 31-32.

---

their ability to be responsive to their clients' needs, any lengthier sentence will increase the danger that Lanco will
fail.

Moreover, the fact that Mr. Gomez and Ms. Gildea are co-defendants in this case raises the possibility that *both* parents will be incarcerated, leaving their three young children without either parent to care or provide for them. See United States v. Aguirre, 214 F.3d 1122, 1127 (9th Cir. 2000) (affirming downward departure of four levels for extraordinary family circumstances where an 8 year old boy whose father was deceased "would be losing a mother for a substantial period of time."). A downward departure is necessary to minimize the already devastating impact imprisonment of both parents, even if staggered, would inflict on these children. The Gomezes' continued presence is necessary for more than mere family stability; it is critical to the preservation of the entire family unit and the future well-being of the family's youngest members. The positive impact of both parents on their children is reflected in letters from third parties who have witnessed the interaction between the Gomez family members:

- The Gomez family are a very close knit, devoted family. In my view, it would not be in their best interest for the children to be separated from their parents. Ex. B, Letter from Margaret Albanese to Judge O'Toole of April 13, 2005.

- Mary and Carlos are consistently involved with the raising of their children. When other families at our school designate the care of their children to a nanny or other care provider, Mary and/or Carlos are transporting and spending the time with their children during these formative years...Their children are the most important part of their lives and I ask that you take this into consideration. Id., Letter from Linda Edmands to Judge O'Toole of April 13, 2005.

- It is not often that an educator comes across a set of parents that lives and breathes for their children the way that in which Mary and Carlos do. But I soon learned that this caring and devotion extended beyond their own children and included not only members of their own family, but for all of the children who were enrolled in our school. Such a devotion can only be characterized as exceptional and extraordinary. Id., Letter from Richmond S. Abbe to Judge O'Toole of April 14, 2005.

- We have watched, first-hand, the Gomez children grow into wonderful, kind and compassionate young people, which is due solely to their parents' guidance and love. Carlos and Mary are good people who are raising a wonderful family, which is no small feat in today's society. To take them away from their family would be tragic and do irreparable harm to the children. We would like to that that a solution could

be reached that would not include punishing the Gomez children as well. Id., Letter from Dr. Alan and Rose Skolnick to Judge O'Toole of April 14, 2005.

In light of the Gomezes' extraordinary family obligations, the proposed sentence is merited whether considered in light of the statutory purposes of § 3553(a) or under the advisory Guidelines framework, and is necessary to prevent severe harm to the Gomezes' entire family, who have come to rely on them for so much.

## IV.   THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES BECAUSE OF THE SIGNIFICANT CONTRIBUTIONS THE GOMEZES HAVE MADE TO THEIR COMMUNITY.

The Gomezes additionally request the proposed sentence on the grounds of their substantial charitable and community activities. These activities are a relevant element of "the history and characteristics of the defendant[s]," which must be considered under 18 U.S.C. § 3553(a)(1). They are also a mitigating factor under the now-advisory Guidelines, warranting a downward departure.

Even when the Guidelines were mandatory, a defendant's charitable and community activities were permissible grounds for adjustment where the activities were exceptional and rendered the case different from the ordinary case. See U.S.S.G. § 5H1.11. See also Koon, 518 U.S. at 96. Particular attention has been paid to those activities that involve significant contributions of the defendant's time and personal skill, rather than those that merely consist of financial contributions. See United States v. Mehta, 307 F. Supp. 2d 270, 277 (D. Mass. 2004) (Gertner, J.) (granting five-level departure). See also United States v. Serafini, 233 F.3d 758, 776 (3d Cir. 2000) (granting three-level departure, noting that "while many of [defendant's] acts involved the giving of money, the monetary aid was only one aspect of otherwise charitable conduct on his part, distinguishing his acts from the impersonal writing of checks that is the

norm for many wealthy individuals"); United States v. Cooper, 394 F.3d 172, 177 (3d Cir. 2005)

(granting four level departure and sentence of probation in securities fraud and tax evasion case

for good works where defendant did not simply donate money to charity, but also engaged in

activities which demonstrated a "hands on personal sacrifice[] which have had a dramatic and

positive impact on the lives of others.").

The Gomezes' contributions to their community are quintessential examples of the kind

of good works that courts look to as grounds for departing downward. The Gomezes have

provided invaluable hands-on service to their community, their children's school (the Andover

School of Montessori), and other charities. See generally Exs. B, M. The Gomezes are much

more than mere financial benefactors to their community.[15]  Indeed, they generously devote their

spare time and energies, often anonymously, to various charitable and educational endeavors.

To that end, Mr. Gomez has taken the initiative on several projects at their children's

school, including grooming school grounds, building shelves in the school library, collecting

trash at school events, and leveling and maintaining the children's playground to ensure its

safety. See generally Ex. B. Ms. Gildea has displayed similar generosity, with her unparalleled

dedication to improving her children's school environment for students and teachers alike and

has actively served on numerous school committees for several years and worked as a tireless

advocate for better health care and other benefits for the school's teachers. See id. Whether

organizing fundraising initiatives, staff appreciation events, shoveling snow, even simply picking

up trash after school picnics, the Gomezes have consistently displayed exceptional leadership

---

[15] It is worth noting, though, that their financial generosity has benefited the school's teachers and community at large, including the Gomezes' assistance in covering the necessary medical expenses of a teacher's husband whose battle with multiple sclerosis left him confined to a wheelchair, unable to work, and without sufficient health care coverage. See Ex. B, Letter from Joan Ellis to Judge O'Toole of April 10, 2005. See also Serafini, 233 F.3d at 776 (where community service and charitable works acknowledged by court in granting departure included providing a $300,000 guarantee for medical treatment of a terminally ill patient).

and generosity towards those around them. See id. As Claire Bradley, a Children's House teacher, states in her letter of support, "[n]o parents have ever had such an impact on our school community during my twenty three years as a teacher here....[A]n interest in helping our students and staff [is] their only concern." Id., Letter from Ms. Bradley to Judge O'Toole of April 15, 2005. Similarly, Richmond Abbe, prior headmaster of the school, states, "Carlos and Mary always gave willingly, not only of their resources, but more importantly of their time, talents, and seemingly endless supply [of] enthusiasm and energy. It was performed out of a true belief and conviction that the work we undertook at school made a significant impact on the lives of children." Id., Letter from Mr. Abbe to Judge O'Toole of April 14, 2005.

The Gomezes' consideration also extends to the community at large, where the Gomezes have supported the work of muralist Be Sargent, who has created several large-scale murals in the Boston area, by providing scaffolding support for her projects at no cost. Ms. Sargent states in her letter of support, "I never was able to raise more than $15,000 for my labor on any of these murals but I could live on that. Nevertheless, I often tried to get a sense of what I was getting for free. Mary or Carlos would say 'never mind, just go on painting.'" Ex. M, Letter from Ms. Sargent to Judge O'Toole of April 12, 2005. In addition, Mr. Gomez has demonstrated his commitment to helping build homes for Rebuilding Together Boston and Habitat for Humanity by providing in-kind donations of scaffolding installation and rental services as evidenced by the letters of support from Martine L. Taylor, Executive Director of Rebuilding Together Boston, and David Lopes, Chief Operating Officer of Habitat for Humanity Greater Boston. Id., Letter from Ms. Taylor to Judge O'Toole of April 18, 2005; Letter from Mr. Lopes to Judge O'Toole of April 12, 2005.

Based upon the foregoing, the proposed sentence, whether in light of the statutory goals of 18 U.S.C. § 3553(a) or under the now-advisory Guidelines framework, will enable the Gomezes, who have been consistently recognized for their positive impact on the community, to continue their longstanding and valuable commitment to community service.

## V.    THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES BECAUSE OF THE EXTRAORDINARY RESTITUTION ALREADY MADE BY THE GOMEZES.

The Court's consideration of "the history and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1) must also include the Gomezes' exceptional endeavors to remedy the harm they have caused, as detailed below.  Extraordinary restitution is also a recognized ground for downward departure under the advisory Guidelines.  See U.S.S.G. § 5K2.0(d)(5); United States v. Kim, 364 F.3d 1235 (11th Cir. 2004) (holding that payment of $280,000 restitution by defendants, a husband and wife, after they pled guilty to conspiracy to defraud the United States and fraudulently obtaining government assistance, respectively, was extraordinary enough to remove case from "heartland" and justify downward departure from 24 months to probation and home detention where defendants' conduct demonstrated their sincere remorse and acceptance of responsibility); United States v. Oligmueller, 198 F.3d 669, 672 (8th Cir. 1999) (affirming district court's one level downward departure on the basis of extraordinary restitution because "[w]e have previously held that cases [are sufficiently atypical] when there are extraordinary efforts at restitution"); United States v. Hairston, 96 F.3d 102, 107-08 (4th Cir. 1997) (paying restitution can, in exceptional circumstances, be basis for departure from Guidelines); United States v. Lieberman, 971 F.2d 989, 996 (3d. Cir. 1992) (affirming departure where defendant agreed to pay "$34,000 more than he thought he owed and to which he pled guilty"); United States v. Garlich, 951 F.2d 161 (8th Cir. 1991) (holding that district court should consider

whether the defendant's extraordinary restitution efforts merited departure or reasonable
sentence out of the Guidelines range);

In this case, the Gomezes have taken extraordinary steps to pay restitution for their
mistakes. As of May 2005, the Gomezes have made total restitution of **$2,262,175.** See Ex. F.
The Gomezes have proactively and voluntarily paid $866,992 to Liberty Mutual Insurance
Group, $145,143 to the Carpenters' Union, and $1,250,000 toward outstanding tax liabilities.
Exs. F, N, O, P, Q. In addition, the Gomezes are committed to ensuring that any amounts owed,
beyond the substantial restitution which has already been made, will be paid in full at the earliest
possible date.[16]

The Gomezes' restitution efforts have been acknowledged by the victims in this case.
Mr. McNally notes that the situation is "currently being remedied" and states,

> Carlos and Mary are committed to making amends with the Laborers. Lanco has
> offered to repay all unpaid union benefits for their employees who were Laborers for
> a period of years to be determined and cooperate in an audit. Based on the
> information that I now have, this is a reasonable manner in which to hold Lanco
> responsible to the Laborers and will result in substantial restitution (over $400,000) to
> the Union. The Laborers are amenable to Lanco paying this amount out over time to
> facilitate repayment and to avoid further straining the business.

Ex. J, p. 2.

## VI.   MS. GILDEA'S CRIMINAL HISTORY CATEGORY SHOULD BE I.

A.   Ms. Gildea Objects To The Assessment Of One Criminal History Point Based On A
Charge To Which She Never Pled Guilty Or Admitted Sufficient Facts And For
Which She Was Subsequently Judicially Determined To Be Innocent.

---

[16] Lanco is profitable and can make reasonable restitution payments going forward. Ex. F. However, the Gomezes'
ongoing restitution efforts are contingent upon Lanco's continuing viability, making a downward departure in this
case even more critical. See United States v. Pearson, 282 F.Supp.2d 941, 944 (E.D. Wis. 2003) (holding that a two-
level downward departure from Level 12 to 10 was appropriate based partly on the fact that sentence
would allow defendant to continue working, better enabling her to pay the substantial restitution she owed to the
victim in the case). Furthermore, "the need to provide restitution to any victims of the offense" is a factor outlined
in § 3553(a) that must be considered by sentencing courts in imposing a just sentence. 18 U.S.C. § 3553(a)(7).

Ms. Gildea objects to Probation's assessment of one criminal history point based upon the diversionary disposition imposed in Woburn District Court on March 22, 2000 in connection with one count of indecent assault and battery and a related count of assault and battery. Gildea PSR ¶ 85. Ms. Gildea has never admitted her guilt or admitted to any facts supporting a finding of guilt. Moreover, at a subsequent civil trial brought by the complainant, Ms. Gildea's actual innocence was resoundingly affirmed by the civil trial judge, Judge Timothy H. Gailey, who found that "[t]here was no assault and battery by the Defendant at any time alleged by the Plaintiff." Judge Gailey found the plaintiff to be "utterly and unequivocally incredible as a witness" and her account of the events to be "totally fabricated and bear no relation whatsoever to the truth." Ex. R, attachment H. Thus, Ms. Gildea was judicially determined, under a lesser standard of proof than beyond a reasonable doubt, to be actually innocent of the charges against her.

### 1. Procedural History.

Ms. Gildea was charged with two counts of assault and battery, based on the now totally discredited allegations of her former housekeeper, Rosalia De Guzman (the "Complainant"), that Ms. Gildea grabbed her shirt, pushed her up against a wall and grabbed her cheeks and chest during a dispute over housekeeping in May 1999. Ex. R, ¶ 5. She adamantly maintained her innocence from the start. Id.

Ms. Gildea appeared in court on March 22, 2000 ready to proceed to trial and defend her innocence against these unwarranted charges. However, at the eleventh-hour, the Commonwealth announced it intended to call her 3 year old daughter Olivia to testify. Id. ¶ 13-14. First, on the day of trial, the Commonwealth filed a Motion in Limine to Admit Olivia Gomez's Out-of-Court Statements Into Evidence As "Spontaneous Utterances." Id. ¶ 14. Olivia

was only 2 years old at the time of the alleged incident, and was only 3 years old on March 22, 2000. Id. The court denied the motion to allow the Complainant to testify about statements allegedly made by Olivia. Id. The Commonwealth then indicated that it intended to call the child herself to testify. Id. This came as a complete surprise to Ms. Gildea and her counsel, as Olivia's name was not on the witness list, she had not been subpoenaed, and Ms. Gildea had received no notice that the Commonwealth intended to call her. Id.

Ms. Gildea's counsel objected to the Commonwealth calling the child to testify on the grounds that Olivia was not old enough to be a competent witness. However, the court indicated it would reserve any ruling on the issue until such time as the Commonwealth called the child during the trial. Id. Ms. Gildea had not foreseen that defending her innocence would subject her child to the trauma of testifying, and she was anguished and visibly upset over the prospect of her child being forced to testify. Id. ¶ 15. She also was given very little time to consult with her attorney about this development, or to fully assess the proposed waiver of rights and plea disposition - with which she was wholly unfamiliar.[17] Id. ¶¶ 16-17.

Ms. Gildea was confronted with a wrenching dilemma; either proceed to trial and defend her innocence or accept a deal for a continuance without a finding ("CWOF") and spare her daughter the trauma of testifying in a criminal trial involving a dispute between her mother and her caretaker. With less than thirty minutes to decide before a jury was empanelled, Ms. Gildea placed her daughter's welfare first and waived her right to a trial. Id. ¶¶ 15-17. While still vigorously maintaining her innocence, and with evident reluctance, Ms. Gildea admitted that the

---

[17] Indeed, when Ms. Gildea evidenced her reluctance to go forward, she was reminded that a jury could be empanelled within one-half hour. Ex. R ¶¶ 15, 24. At another point, the Court, out of frustration with Ms. Gildea's reluctance to admit sufficient facts, announced that the trial would commence. Ms. Gildea obviously felt unduly pressured by these time constraints into making an unexpected and unwelcome decision to accept the diversionary disposition to protect her daughter.

government had in its possession facts sufficient to establish guilt. Id. ¶ 18. She did not however, admit the alleged facts themselves, or any culpability. See id., attachment G; Ex. S.

As evidenced by the plea, Ms. Gildea did not admit guilt or admit to facts sufficient to support guilt. See Ex. R, attachment G, pp. 13-17. She merely conceded that the governments evidence, which she did not admit to, was sufficient to establish guilt. Given that this was the classic "he said-she said" case, with the government's case hinging on the credibility of the complainant, Ms. Gildea was, in essence, conceding, and only reluctantly, nothing more than that if the jury believed the complainant, there would be sufficient evidence to establish guilt.[18] See, e.g., Santos v. Director of the Division of Employment Security, 398 Mass. 471, 473 (1986) (admission to sufficient facts did not constitute an admission to any personal criminal involvement). The case was continued without a finding, Ms. Gildea completed an 18-month period of unsupervised probation and the case was ultimately dismissed. Ex. R ¶ 21.[19]

2. Subsequent Judicial Determination Of Complete Innocence.

Within days after the criminal proceeding was resolved, Ms. Gildea's accuser filed a civil suit in Chelsea District Court. De Guzman v. Gildea Gomez, Civ. No. 0014CV0031. See id. ¶ 22. The subsequent civil trial and the civil court's findings conclusively show that the

---

[18] As Ms. Gildea's attorney, Mr. DiGiulio, stated: "Ms. Gomez was not required to admit to any of the alleged facts supporting the charges. Instead, she merely acknowledged that the facts alleged, if believed by a jury, would be sufficient to support a guilty verdict. Ms. Gomez steadfastly maintained her actual innocence throughout the plea colloquy.... Ms. Gomez checked neither "Plea of Guilty" nor "Admission of Facts Sufficient for a Finding of Guilty" on [the Tender of Plea or Admission and Waiver of Rights] form." Ex. S. Thus, Ms. Gildea did not admit to sufficient facts or indeed to any facts. She merely acknowledged that if the alleged facts were believed by a jury they would be sufficient to support a guilty verdict.

[19] The colloquy was also defective in that the court failed to inform Ms. Gildea that a jury could not construe her failure to testify at trial against her. Although the court explained that Ms. Gildea could not be forced to testify at trial, it failed to further explain that a jury would not be allowed to draw any adverse inferences from her failure to testify. The colloquy violated Ms. Gildea's constitutional rights. An intelligent plea requires that the defendant know of the procedural protections she is relinquishing by tendering a plea. Commonwealth v. Correa, 43 Mass. App. Ct. 714, 717, 686 N.E.2d 213, 216 (1997). The judge must ensure that the defendant is informed, on the record and in open court, of the three constitutional rights that are waived when tendering a plea: "the right to trial, the

original criminal complaint – and the plea disposition – were based upon false allegations. Indeed, Judge Gailey found a "myriad of inconsistencies in [Complainant's] accounts of the alleged incidents, [her] record of physical and psychological treatment before and after the alleged incidents, and [her] false and inconsistent testimony as to her medical conditions and treatments." Id. ¶ 26. These were the very same allegations upon which the criminal charges were founded. Based in part on newly discovered evidence, after a bench trial, Judge Gailey concluded that the Complainant was "*utterly and unequivocally incredible as a witness*" and that it was more likely than not that her allegations were "*totally fabricated and bear no relation whatsoever to the truth*." Id. ¶ 26 (emphasis added). The court entered judgment for Ms. Gildea, concluding that "*[t]here was no assault and battery by [Ms. Gildea] at any time alleged by the [Complainant]*." Id. (emphasis added). See also Ex. R, attachment H.

Due process and justice mandate that this diversionary disposition should not be included in calculating Ms. Gildea's criminal history category. The Commonwealth's case was based upon the word of an unstable woman clearly motivated by economic gain, whose testimony was resoundingly rejected as false by Judge Gailey, applying the lesser, civil preponderance of the evidence, standard of proof, rather than the beyond a reasonable doubt standard.

A fair reading of the plea colloquy reveals that Ms. Gildea struggled -- for understandable reasons – with even admitting that the government had sufficient facts. See id.; Ex. R at 13-17. Even her limited colloquy was tendered under duress. In addition, while the court apprised Ms. Gildea that she had a right not to testify at trial, it did not advise her, as required, that neither a judge nor a jury could hold her silence against her in deciding the case. Given the context of this case, this omission by the court constituted a violation of Ms. Gildea's due process rights.

---

right to confront one's accusers, and the privilege against self-incrimination." Id. (quoting Commonwealth v. Duquette, 386 Mass. 834, 841 (1982)).

Coupled with the obvious duress under which the plea was tendered and the subsequent judicial

finding of actual innocence by Judge Gailey, this diversionary disposition should not be counted

in calculating Ms. Gildea's criminal history.

### 3. A Diversionary Disposition Without A Finding Of Guilt Should Not Be Counted.

U.S.S.G. § 4A1.2 provides, in relevant part, that: "Diversion from the judicial process

without a finding of guilt (e.g., deferred prosecution) is not counted. A diversionary disposition

resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial

proceeding is counted as a sentence under §4A1.1(c) even if a conviction is not formally

entered...." Application Note 9, Diversionary Dispositions, provides, in relevant part, that:

"Section 4A1.2(f) requires counting prior adult diversionary dispositions if they involved a

judicial determination of guilt or an admission of guilt in open court." U.S.S.G. § 4A1.2, cmt.

n.9.

This case presents the unique instance where not only was there no admission of guilt,

but where the defendant was actually judicially determined to be completely innocent of the

charges under a lesser standard of proof than would have been required at a criminal trial.  This

dramatically distinguishes this case from the line of First Circuit cases upholding the assessment

of criminal history points based on continuances without a finding.  See, e.g., United States v.

Morillo, 178 F.3d 18, 21 (1st Cir. 1999) (in contrast to Gildea, defendant acknowledged on the

Tender of Plea or Admission Waiver of Rights form that he was tendering an "admission to facts

sufficient for a finding of guilt;" no claim defendant actually innocent of charges); United States

v. Dubovsky, 279 F.3d 5, 9 (1st Cir. 2002) (no claim that defendant was actually innocent of

charge); United States v. Fraser, 388 F.3d 371(1st Cir. 2004) (defendant admitted guilt in open

court).  While district courts typically may not question the validity of the underlying CWOF,

see, e.g., United States v. Reyes, 386 F.3d 332 (1st Cir. 2004), that should not apply where, as

here, there is not just an actual claim of innocence but a judicial finding of innocence. Finally, it

is well-settled that where the underlying state court sentence is determined not to count, the two-

level enhancement for committing the federal offense while on probation for the state sentence

also must be erased. See Mateo v. United States, 398 F.3d 126, 133 (1st Cir. 2005) (citing

U.S.S.G. §§ 4A1.2(j), 4A1.2, cmt. n.6).

B. The Court Should Grant A Downward Departure From Criminal History Category II
To Criminal History Category I On The Grounds That Category II Substantially
Over-Represents The Seriousness Of The Offense And The Likelihood Of
Recidivism.

Alternatively, Ms. Gildea moves for a downward departure from criminal history

category II to criminal history category I, pursuant to U.S.S.G. § 4A1.3(b)(1), on the grounds

that her criminal history category: a) substantially over-represents the seriousness of her criminal

history; and b) the likelihood that she will commit other crimes, given her age, her love of and

concern for her children and other family members, her genuine remorse and her outstanding

efforts at restitution and rehabilitation discussed below and in more detail in the letters of support

submitted by a wide range of acquaintances.

1. Criminal History II Substantially Over-Represents The Seriousness Of Ms.
Gildea's Criminal History As It Is Based On A Disposition For Which She
Was Clearly Innocent.

As discussed above, Ms. Gildea was judicially determined to be innocent, under a lesser

standard of proof than beyond a reasonable doubt, of the two charges that formed the basis for

the diversionary disposition referenced in paragraph 85 of her PSR, and for which Probation

assesses one criminal history point. Probation assessed an additional two points, pursuant to

U.S.S.G. § 4A1.1(d), because the instant offense occurred during the time that Ms. Gildea was

under a criminal justice diversionary sentence for those charges. Given that Ms. Gildea was

actually innocent of those charges, the resulting three criminal history points substantially over-represent the seriousness of her criminal history. Accordingly, pursuant to U.S.S.G.

§ 4A1.3(b)(1), Ms. Gildea moves for a downward departure from criminal history II to criminal history I , on the grounds that category II unfairly punishes Ms. Gildea for a crime she did not commit, and that category I more accurately reflects her criminal history.

### 2. Criminal History Category II Substantially Over-Represents The Likelihood That Ms. Gildea Will Commit Other Crimes.

Ms. Gildea is a 48 year old mother of three young children; she is a partner in a very stable marriage. She has no alcohol or drug addiction problems, is financially secure, and has no history of violence, aside from the totally discredited charges of her mentally unstable former housekeeper.[20] She has fully accepted responsibility for her crimes and has taken, and continues to take, all reasonable measures to make restitution to each of the victims.

In addition, as amply demonstrated by the many testimonials from the children's Montessori school, Ms. Gildea and her husband are deeply and unusually devoted to their children's upbringing and welfare. For the past several years, Ms. Gildea has had to live every day with the fear that her three children will lose both parents to potentially lengthy periods of incarceration. It is inconceivable that a woman of Ms. Gildea's maturity and proven responsibility to her children would do anything to place herself and her family in similar legal jeopardy again. Thus, aside from the fact that she was actually innocent of the charges that result in a criminal history category II calculation, given Ms. Gildea's age and maturity, her remorse, her demonstrable efforts to make amends, and her family responsibilities, there is

---

[20] Although Ms. Gildea's PSR references several extremely minor petty offenses involving, for example, bounced checks of $15.70 and $17.99 (Gildea PSR ¶ 81), a dispute over a $5 scarf (Gildea PSR ¶ 82), and one other matter involving less than $300 (Gildea PSR ¶ 83-84), these offenses occurred many years ago, and they are not includable, for good reason, in calculating her criminal history category. Thus, the court should not consider them in

absolutely no "likelihood of recidivism" in her case. Accordingly, Ms. Gildea moves for a downward departure to criminal history category I on the grounds that criminal history category II over-represents the likelihood that she will commit other crimes.

## VII.  THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES FOR MR. GOMEZ BECAUSE OF HIS PRIOR WRONGFUL CONVICTION AND TIME ERRONEOUSLY SERVED.

Mr. Gomez's prior wrongful conviction and incarceration merits consideration by the Court as part of "the history and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1). In 1991, Mr. Gomez was convicted in a jury trial and incarcerated for more than one year for a crime he did not commit. See Gomez PSR ¶ 91. The charges against him were based upon entirely fabricated evidence and testimony. See Ex. T. Mr. Gomez was convicted by the jury based upon the testimony of the prosecution's key witness. See id. Mr. Gomez was finally vindicated of this conviction by prevailing on a Motion for New Trial before the trial court, which was granted because of the discovery of new evidence which led Superior Court Judge Robert H. Bohn, Jr. to conclude that the testimony of the prosecution's key witness against him was "false and misleading in a material respect." See id. Mr. Gomez had strenuously maintained his innocence throughout the trial, and the newly discovered evidence was consistent with his version of the relevant events and entirely inconsistent with that of the prosecution's witness. See id. The Middlesex County District Attorney's office then chose not to pursue a re-trial of the matter, and the case was ultimately Nolle Prosequi on November 4, 1997. However, as a result of the false testimony against him, Mr. Gomez was wrongfully imprisoned for more than one year before he was finally exonerated. See id. As stated by Barry P. Wilson, Esq., who represented Mr. Gomez following his conviction, "[T]hough justice was ultimately served, [Mr.

---

determining the likelihood of recidivism. Even if the court does consider them, their age and petty nature make them entirely irrelevant to the issue of Ms. Gildea's likelihood for recidivism in 2005 given her current stage of life.

Gomez] must have endured untold anguish during those 13 months." Id. The pain that Mr.

Gomez had to endure in being falsely charged, and then convicted and sentenced to jail, must be

considered by the Court in determining a sufficient, but not greater than necessary, sentence in

this case.

    Furthermore, a downward departure based upon Mr. Gomez's prior wrongful conviction

and incarceration is warranted under the advisory Guidelines. As acknowledged by the

Sentencing Commission when the first set of Guidelines was promulgated, "it is difficult to

prescribe a single set of guidelines that encompasses the vast range of human conduct potentially

relevant to a sentencing decision." See U.S.S.G. § 5K2.0, cmt. background. Sentencing courts

therefore have discretion to depart from the applicable Guideline range on those grounds when

"mechanical application of the guidelines would fail to achieve the statutory purposes and goals

of sentencing." See id. See also United States v. Miller, 991 F.2d 552, 554 (9th Cir. 1993)

(holding that where defendant had erroneously served 6 months of home detention, district court

was free to depart "because the Commission seems not to have considered the issue of

compensating for time erroneously served"). The atypical circumstances of Mr. Gomez's prior

wrongful conviction clearly render this case one outside the "heartland" of cases the Guidelines

were designed to address, and warrant "compensation" for time erroneously served. See Koon,

518 U.S. at 94 (noting that the Guidelines allow district courts to depart in cases that feature

aggravating or mitigating circumstances of a kind or degree not adequately taken into

consideration by the Sentencing Commission); Miller, 991 F.2d at 554.

**VIII. THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES IN LIGHT OF THE TOTALITY OF THE CIRCUMSTANCES PRESENT IN THIS CASE.**

Under the requirement of 18 U.S.C. § 3553(a)(1) that sentencing courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant," all the facts detailed above should be considered as a whole in determining a sufficient, but not greater than necessary, sentence for the Gomezes. Taken as a whole, these facts support the Gomezes' requests for the proposed sentence under the post-<u>Booker</u> statutory scheme.

Similarly, the Sentencing Commission specifically authorized downward departures based on a combination of such factors, which when taken *collectively* differ significantly from the heartland of cases covered by the Guidelines, even though none of the characteristics or circumstances *individually* warrant departure. <u>See</u> U.S.S.G. §§ 5K2.0(a)(2)(A), (c) (emphasis added). The First Circuit has embraced such a departure analysis in holding that the convergence of factors in a case may, in combination, suffice to remove it from heartland of the Guidelines. <u>See</u> <u>United States v. Sklar</u>, 920 F.2d 107, 117 (1st Cir. 1990).

Therefore, while the numerous grounds listed above are individually adequate to warrant the proposed sentence, particularly in light of the statutory purposes set forth under § 3553(a)(1), should the Court find that no single factor is sufficient on its own to justify a departure under the now-advisory Guidelines, the Gomezes urge that a downward departure is warranted based on the totality of the circumstances in the instant case which, taken together, are present in a substantial degree to remove it from the heartland of the Guidelines.

<u>CONCLUSION</u>

In consideration of all of the factors described under 18 U.S.C. § 3553(a), as well as the now-advisory Sentencing Guidelines, the Gomezes request that this Court impose a sentence of:

five years' probation, with the following special conditions: a) a period of eight months home detention; b) full compliance with a restitution schedule with the Laborer's Union as approved by the Court; c) full cooperation with the Internal Revenue Service in calculating any additional taxes owed by Lanco and/or the Gomezes; d) participation in a community service plan involving Habitat for Humanity as approved by the Court; and e) payment of a $10,000 fine each.

Respectfully submitted,

/s/ Harry L. Manion III
Harry L. Manion III, BBO # 317440
Christopher J. Cunio, BBO # 634518
Cooley Manion Jones LLP
21 Custom House Street
Boston, MA 02110
617-737-3100
*Counsel for Defendant Carlos Gomez*

/s/ Joseph F. Savage, Jr.
Joseph F. Savage, Jr., Esq., BBO 443030
Kevin P. McGrath, Esq., BBO #550123
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
617-570-1000
*Counsel for Defendant Mary Gildea*

Dated: August 15, 2005

146189.1

50

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2005, a copy of the following documents were served via first-class mail upon U.S. Probation Officer Stephanie K. Henshaw and Assistant U.S. Attorney Paul G. Levenson:

- Defendants' Joint Motion for Downward Departure;
- Defendants' Sentencing Memorandum (with exhibits); and
- Defendants' Assented-To Motion for Leave to File a Memorandum in Excess of Twenty (20) Pages; and

/s/ Harry L. Manion III